IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| DAVID P. MADDEN, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. CIV-13-393-HE |
| | ) | |
| REGIONAL UNIVERSITY SYSTEM OF | ) | |
| OKLAHOMA, a State of Oklahoma | ) | |
| constitutionally created governing board; | ) | |
| NORTHEASTERN STATE UNIVERSITY, | ) | |
| a public university; CARI KELLER, an | ) | |
| individual (in her individual and official | ) | |
| capacity); PHILLIP BRIDGMON, an | ) | |
| individual (in his individual and official | ) | |
| capacity), | ) | |
| Defendants. | ) | |

## COMPLAINT

_____

COMES NOW the Plaintiff, David P. Madden ("Plaintiff" or "Plaintiff Madden"), by and through his attorney, McLaine DeWitt Herndon, and for his Complaint against Defendants, states as follows:

## JURISDICTION AND VENUE

1.      This action arises and is brought pursuant to 42 U.S.C. § 1983 to remedy the deprivation, under color of state law, of rights guaranteed to all of its citizens, including Plaintiff, by the United States Constitution, specifically, the First Amendment and the Due Process and Equal Protection Clauses of the Fourteenth Amendment. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331.

2.      Venue in this Court is proper under 28 U.S. C. § 1391(b)(1) as the Defendant Regional University System of Oklahoma (hereinafter "RUSO") is located in this district and all other Defendants are located in this state.

## JURY DEMAND

3.      Plaintiff hereby respectfully demands a jury trial pursuant to 42 U.S.C. § 1983(a).

## THE PARTIES

4.      Plaintiff Madden is, and was at all times mentioned herein, an adult citizen of the United States and a resident of the State of Oklahoma, Cherokee County.  He is an assistant professor of criminal justice at Northeastern State University (hereinafter "University" or "NSU").

5.      Defendant NSU is a state actor and a public university located in Tahlequah, Oklahoma and is currently Plaintiff Madden's employer.

6.      Defendant RUSO is a state of Oklahoma constitutionally created governing board and is responsible for governance of NSU, Plaintiff Madden's employer.

7.      Defendant Phillip Bridgmon (hereinafter "Dean Bridgmon" or "Bridgmon") is sued both in his individual and official capacities, as a state actor and employer.  He is, and was at all times mentioned herein, an adult citizen of the United States and the Dean of the College of Liberal Arts at NSU, a public university supported by the federal and state tax dollars of Oklahomans.  Dean Bridgmon is responsible for making the final decision with respect to hiring and firing of professors and academicians in the College of Liberal Arts and was the final decision maker in the decision not to retain Plaintiff Madden.

8.      Defendant Cari Keller (hereinafter "Ms. Keller") is a professor of criminal justice at NSU and the Chair of the Department of Criminal Justice and Legal Studies at NSU.  She is sued both in her individual and official capacities, as a state actor.  She is, and was at all times mentioned herein, an adult citizen of the United States and the Chair of the Department of

Criminal Justice and Legal Studies at NSU and a decision maker and key player in the decision not to retain Plaintiff Madden.

## STATEMENT OF FACTS

9.      Plaintiff Madden graduated from the University of Tulsa, College of Law in 1979 and worked for over 30 years in Tulsa, Oklahoma; Overland Park, Kansas; Kansas City, Missouri and Texas in the capacity of associate, partner, managing partner and "of counsel" as a trial lawyer.  He was a Certified Civil Trial Lawyer by the National Board of Trial Advocacy and was elected to the American Board of Trial advocacy by his peers. He was also rated as AV by Martindale-Hubbell.

10.      In 2007, he moved to Tahlequah where he worked for Legal Aid, as a staff attorney, assisting the indigent and disenfranchised in need of legal assistance in Northeastern Oklahoma.

11.      In 2008, he applied for a position as an adjunct professor with NSU.  He was hired to teach as an adjunct professor in the Criminal Justice and Legal Studies Program, (hereinafter the "Legal Studies Program") at NSU's Broken Arrow campus.

12.      In 2009, he was hired as a full time tenure track assistant professor and began teaching in the Legal Studies Program at NSU's Broken Arrow and later Tahlequah campus.

**Plaintiff Madden's Criticism of the University:**

13.       While working as an assistant professor in the Legal Studies Program, Plaintiff Madden advocated for greater scholarship requirements for professors in the Legal Studies Program, for enhanced writing programs for the students and more academic training for the Program's students, and was critical in general of NSU's failure to implement programs to better scholarship as well as student success at NSU. Plaintiff Madden was asked to investigate and

make a determination as to whether the NSU Legal Studies Program should seek accreditation for its paralegal studies program. Professor Madden made a recommendation in 2010 that the University seek accreditation of its paralegal program by the American Bar Association. This accreditation would have resulted in many benefits to the students enrolled in the program.  In order to obtain accreditation, Mr. Madden argued that the school's library resources should be upgraded.

14.     Specifically, Plaintiff Madden was critical of NSU and the Criminal Justice Program's failure to properly fund, staff and implement the Collegiate Officer Program (hereinafter "COP").  COP is designed to enable students to obtain certification from the state of Oklahoma as peace officers as a result of completing a training program while enrolled in a baccalaureate program at a four year university.   In 2009, Plaintiff Madden was asked to and agreed to take over as director of COP.

15.     Before Plaintiff Madden took over the program, it had been in existence at NSU for approximately twenty (20) years and yet no one had ever graduated from the program.

16.     COP has specific requirements, some of which were being met under the prior director's control.  The COP director immediately prior to Plaintiff Madden was Steve Dunker (hereinafter "Mr. Dunker").  While Plaintiff Madden was assigned to teaching duties in Broken Arrow, faculty members discussed in his presence how Mr. Dunker had obtained tenure. These faculty members asserted that no one had voted in favor of Mr. Dunker obtaining tenure, and one faculty member asserted that all of the tenured faculty members on the committee had abstained from voting for Mr. Dunker's tenure. It was asserted by one faculty member that the only scholarship that Mr. Dunker had engaged in was preparing a test based upon text book instructions. Despite objections, Mr. Dunker obtained tenure.  This was the last faculty member

to obtain tenure before Plaintiff Madden was hired.  CLEET requires the professors teaching the law courses for the COP program to be lawyers admitted to the practice of law in the state of Oklahoma. Mr. Dunker had taught these courses in the program for years and was not admitted to the practice of law in Oklahoma.  Mr. Dunker had also claimed to be a certified Oklahoma Police Officer, which he was not.  No one in the department had discovered these omissions until Plaintiff Madden was asked to take over the COP program.

17.    The Collegiate Officer Program at NSU had no funding and only through the energy and contacts of one of the faculty members in Broken Arrow was the program able to put together practical skill courses to complete all the requirements for COP students. In the two years that he was director of the program, Plaintiff Madden expended considerable personal time and financial support to the students enrolled in the program, including driving students back and forth from Tahlequah to Broken Arrow on a daily basis so the students would not have to spend personal funds for transportation costs. He purchased targets for firearms training out of his own funds and then made sure that he was on-site on a daily basis for training to monitor instruction and ensure that CLEET requirements were being met.  Exhibit 1 is a letter from the director of the Collegiate Officer Program to Dean Paul Westbrook, commending Plaintiff Madden for his efforts with regard to the program.

18.    Plaintiff Madden was highly critical of NSU for allowing the credentialing lapse enumerated in paragraph 16 above and continued to voice his concerns regarding the level of scholarship and teaching as it currently existed at NSU.  Plaintiff Madden was publically critical of NSU's failure to adhere to standard scholarship requirements as well as its failure to follow policy and procedure of both the programs offered to students as well as the academic and internal policies that applied to professors and other academicians.

19.   Plaintiff Madden was critical of the employment of adjuncts who did not adequately academically engage the students who were charged to their care.  In the fall of 2012, Phyllis Willmon, secretary of the Dean of the College of Liberal Arts, had a conversation with Plaintiff Madden in which she indicated she had been a dinner guest at the home of some friends. These friends related to Ms. Willmon that their son's life had been changed by a professor at NSU, and that professor was Plaintiff Madden.  Ms. Willmon stated to Plaintiff Madden that the problem in the Criminal Justice Department was adjuncts.

20.   Despite these criticisms, throughout his employment at NSU Plaintiff Madden received high ratings from student evaluations, which are well documented, as well as exemplary reviews from colleagues and in annual reviews.  He received these positive ratings despite the fact that Plaintiff Madden was at times critical of NSU and made it a goal as an academician to improve the University by insisting on the importance of implementing various academic-related benchmarks and standards for faculty and students.

21.   Plaintiff Madden's criticisms of NSU were made as an academic speaking on matters of public concern at a public university.

**Plaintiff Madden's 2012 Criticism of Potential Violation of University Anti-Nepotism Policy:**

22.   In March of 2012, a colleague from another department, Dr. Brad Agnew (hereinafter "Dr. Agnew") approached Plaintiff Madden and asked him what he thought about what Dr. Agnew saw as a potential violation of the University's anti-nepotism policy.  See Exhibit 2 (email from Brad Agnew).

23.   Dr. Agnew was a faculty member of the History department. He has taught at NSU for 50 years and is known as the historian of NSU.

24.     Specifically, Dr. Agnew told Plaintiff Madden that the Political Science hiring committee was being pressured to hire the wife of the incoming Dean, Dean Bridgmon, for a position in the Political Science Department.

25.     Dr. Agnew knew that Plaintiff Madden had been a practicing attorney for thirty (30) years and was interested in Plaintiff Madden's interpretation of the University handbook with respect to this issue.

26.     Upon reviewing the University handbook, Plaintiff Madden agreed with Dr. Agnew that hiring Dean Bridgmon's wife in this position would in fact be a violation of the University's anti-nepotism policy. Dean Bridgmon's wife was eventually hired.

27.     Plaintiff Madden openly discussed this issue with Dr. Agnew both at the University and in private.

28.     Dr. Agnew did not ask for Plaintiff Madden's interpretation of NSU's policy on this point as an official matter, but rather as two individuals discussing their interpretation of NSU's actions.

29.     Plaintiff Madden discussed this anti-nepotism issue with several individuals, including with another colleague in Dr. Agnew's department, Mark Carper (hereinafter "Dr. Carper"), stating again that he believed hiring of the new Dean's wife to be a violation of the University's anti-nepotism policy.

30.     In reality, this anti-nepotism issue at NSU did not have any bearing on Plaintiff Madden, his official duties or his teaching and it would have no direct impact on and was truly no concern for Plaintiff Madden in his function in his own department at the University. This opinion was not given within the course and scope of any assigned duties at NSU.

31.     Plaintiff Madden merely engaged in free and open criticism of the University, identifying yet another instance of the University's failure to follow standards and protocols – this time in another faculty member's department.

32.     Approximately two weeks after his discussion with Dr. Agnew, the chair of the Social Sciences department, William Corbett (hereinafter "Dr. Corbett"), came to Dr. Carper's office, located adjacent to Plaintiff Madden's office, and announced in a very loud voice that "it is not true that the committee is being pressured."

33.     After Dr. Corbett confronted Dr. Carper about these criticisms, Plaintiff Madden followed Dr. Corbett to his office and informed him that it was Dr. Corbett's colleague, Dr. Agnew, who was the source of the information concerning the committee being pressured.

34.     Dean Bridgmon, the new Dean of the College of Liberal Arts, did not start his service at the University until July 2012, more than four (4) months following Plaintiff Madden's discussions about whether the Political Science Department's hiring committee was being pressured to hire his wife and whether this action was a violation of the anti-nepotism policy.

**Spring 2013 Evaluation of Plaintiff Madden:**

35.     Ms. Cari Keller is the head of the Legal Studies Program and is responsible for evaluating professors within that Department, including Plaintiff Madden.

36.     On February 11, 2013, Plaintiff Madden was formally reviewed by Ms. Keller. He received on target "meets criteria" marks for both scholarship and collegiality and "above criteria" for teaching and University service. Ms. Keller recommended that Plaintiff Madden be retained. This evaluation was consistent with three previous evaluations done by Ms. Keller as part of the tenure and retention review process. See Exhibits 3, 4, 5 and 6 (annual evaluations).

37.     From February 14th until the 17th 2013, Plaintiff Madden was on a school sponsored trip to Dallas as coach for the University's Mock Trial Team.  When he returned, on approximately February 17, 2013, he received an email from Ms. Keller indicating that a non-departmental colleague had complained about his conduct and other negative matters.

38.     Further, directly upon his return, Plaintiff Madden was told by another colleague, Adam Langsom, that while he was on the school trip, Ms. Keller appeared to have been interviewing various faculty members concerning Plaintiff Madden.

39.     Following the February 17th email from Ms. Keller, Plaintiff Madden had a discussion with her wherein she revealed that she had conversations with both Dr. Corbett and Dean Bridgmon concerning Plaintiff Madden's criticism of the University in relation to the anti-nepotism policy.

40.     During this conversation, Ms. Keller informed Plaintiff Madden that it was "not his job to interpret University policy."

41.     Ms. Keller admits to asking for a conference in February 2013 with Dr. Corbett to discuss Plaintiff Madden's conversation about nepotism with him.

42.     This admonishment took place after Ms. Keller's evaluation of Plaintiff Madden in which he was marked for retention and after her conversation with Dean Bridgmon where he had raised the issue of Plaintiff Madden's concerns regarding the hiring of his wife.

43.     After this meeting, Plaintiff Madden had very little contact with Ms. Keller.

44.     On February 27, 2013, Dean Bridgmon summoned Plaintiff Madden to his office and gave him notice that he would not be retained. Dean Bridgmon had never talked to Plaintiff Madden prior to February 27th about any issue. There was no prior criticism. There was no counseling. There was no evaluation.

45.     It is unclear how the March 2012 criticisms and discussions were relayed to Dean Bridgmon; however, in a conversation with Ms. Keller, he claimed knowledge of the incident from an unidentified informer.

**NSU's Purported Reasons for Non-Retention of Plaintiff Madden:**

46.     As grounds for its decision not to retain Plaintiff Madden, the University cited his (1) failure to meet scholarship requirements and (2) non-collegiality.  However, neither of these grounds is supported by the documented history of Plaintiff Madden's employment.

47.     As to scholarship, the claim by the University that Plaintiff Madden did not meet this requirement is unfounded given the fact that Plaintiff Madden is the professor who pushed hardest for and championed the necessity and importance of peer-reviewed scholarship among the faculty in the Legal Studies Program and employment of Ph.D.'s in order to bring NSU's program more into line with national programs in criminal justice.

48.     There was no requirement to publish articles in peer reviewed journals until Plaintiff Madden argued that all of the faculty should be required to publish at least one article in a peer-reviewed journal prior to their consideration for tenure. Other faculty members also supported the idea that the Legal Studies Program did not have an acceptable scholarship requirement.

49.     Additionally, a review of those professors who are either still up for tenure, i.e., being retained, or who recently received tenure would reveal that their scholarship is on level or below that of Plaintiff Madden.

50.     Moreover, this reason for non-retention is untenable given Plaintiff Madden's February 11, 2013 review by Ms. Keller stating that Plaintiff Madden *currently meets* the scholarship criteria.

51.     It is unclear how Plaintiff Madden could be found to meet the scholarship on February 11, 2013 and 16 days later his lack of scholarship could be grounds for his non-retention.   His scholarship would have been the same at both instances and was on target or above other professors in the same department who were retained.   Dean Bridgmon's reasoning is clearly pretextual and inconsistent with written evaluations of Plaintiff Madden's work.

52.     Regarding the claim of Plaintiff Madden's non-collegiality, Plaintiff Madden's personnel file, past as well as 2013 reviews by the Chair, and the number of recommendation letters he has received from other professors since the University's decision not to retain him are indicative that this claimed reason for non-retention is pretext.

53.     Plaintiff Madden was told by Dean Bridgmon when he received his non-retention letter that a poll of the faculty in the Legal Studies Department indicated they would not vote for him for tenure.   This assertion is clearly not fact-based. There were only five tenured professors in the Criminal Justice Department when Dean Bridgmon made this statement. However, upon information and belief, it is clear that no poll was taken of all the tenured faculty members. Specifically, Charles Dreveskracht said that he had never been consulted about Plaintiff Madden's retention or chances for tenure. Mr. Dreveskracht, instead, appeared surprised that Plaintiff Madden had not been retained.

54.     Plaintiff Madden's file and the history of his interactions with various faculty members demonstrate none of Plaintiff Madden's actions went beyond zealous representation of his ideas for growth and a commitment to maintaining the highest quality of scholarship for all faculty and students.

55.     While Plaintiff Madden was known to be constructively critical of the University and the Legal Studies Program's commitment to academic growth, the criticism of the University

11

regarding the employment of the Dean's wife and the University's violation of the anti-nepotism policy was more than the University would tolerate.

## CLAIMS FOR RELIEF

### COUNT I:
### VIOLATION OF THE FIRST AMENDMENT

56.     Plaintiff hereby incorporates paragraph 1 through 55.

57.     The First Amendment of the United States Constitution guarantees individuals the right to associate and express themselves on matters of public concern without fear of reprisal from their government.

58.     This guarantee prohibits the government, when acting as employer, from firing, refusing to promote and / or refusing to hire citizens because of their private views and opinions on matters of public concern.

59.     NSU, a public university funded by state and federal tax dollars, has violated Plaintiff Madden's First Amendment rights by allowing Dean Bridgmon, under color of law, to target and discriminate against Plaintiff Madden for his criticism of University-sanctioned actions and potential violations of its anti-nepotism policy.

60.     NSU, a public university funded by state and federal tax dollars, has violated Plaintiff Madden's First Amendment rights by allowing Ms. Keller, under color of law, to target and discriminate against Plaintiff Madden for his criticism of University-sanctioned actions and potential violations of its anti-nepotism policy.

61.     RUSO, a public board funded by state tax dollars, has violated Plaintiff Madden's First Amendment rights by failing to ensure Plaintiff Madden was not targeted and retaliated against for his exercise of his First Amendment rights.  RUSO is responsible for governance of Oklahoma's Regional University System, including NSU.

62.     RUSO is responsible for (1) reviewing the general academic policy and its administration within the six regional universities, including NSU; (2) being informed of relevant academic issues and their potential impact on the institutions; and (3) cooperating with institutional Presidents and Chief Academic Officers in planning strategy to address issues at the institutional and governing Board level of the State System.

63.     In this case, Dean Bridgmon, individually and acting on behalf of the governmental employer, NSU, has violated Plaintiff Madden's First Amendment rights by refusing to retain him as a professor at NSU because he exercised his First Amendment Rights in criticizing the University for its violation of the anti-nepotism policy.

64.     Ms. Keller, individually and acting on behalf of the governmental employer, NSU, has violated Plaintiff Madden's First Amendment rights by working with Dean Bridgmon to build a superficial and bogus case against Plaintiff Madden in order to justify the non-retention solely because he exercised his First Amendment Rights in criticizing the University for its violation of the anti-nepotism policy.

65.     The University, Dean Bridgmon, RUSO and Ms. Keller retaliated against Plaintiff Madden for exercising his right to free speech provided by the First Amendment of the United States Constitution in the following particulars:  by not retaining Plaintiff Madden for private statements made by him which touched on a matter of public concern.  Speech touches on matters of public concern when it is spoken by a public employee and when it deals with matters of political, social or other community concern.

66.     Plaintiff Madden's criticism of the University's actions outweighs the University's, Dean Bridgmon's, RUSO's and Ms. Keller's interest in regulating Plaintiff Madden's speech.

67.     As a direct and proximate cause of the University's, Dean Bridgmon's, RUSO's and Ms. Keller's actions, Plaintiff Madden has suffered economic damages in an amount not less than $1,000,000.00.

68.     Pursuant to 42 U.S.C. § 1983, Plaintiff Madden is entitled to recover a money judgment for his economic damages, judgment for his attorney's fees and costs incurred and punitive damages.   Plaintiff Madden is further entitled to such injunctive and equitable relief as the Court deems just and proper.

COUNT II:
VIOLATIONS OF DUE PROCESS & EQUAL PROTECTION

(i)
Changing the Evaluation

69.     Plaintiff hereby incorporates paragraphs 1 through 68.

70.     The essential guarantee of the Due Process Clause of the United States Constitution is that of fairness: government processes must be fair and impartial.

71.     When the government acts as a prospective employer, due process forbids it from changing the evaluative process and criteria after it has been officially completed.   Plaintiff Madden, evaluated among other areas, on his level of scholarship and collegiality, was found to have satisfactorily satisfied these criteria one instant and suddenly found to be lacking these credentials sufficient to warrant his non-retention the next.   In its simplest form, the criteria of an acceptable level of "scholarship" in university professors can be defined as the means by which they remain current in their discipline, improve their knowledge thus making them better teachers, and bring recognition to the institution and themselves.

72.     NSU and the Legal Studies Department did not have set criterion by which to judge scholarship and Plaintiff Madden was critical of this lack of University policy.

14

73.     In this case, Plaintiff Madden was reviewed and recommended for retention on February 11, 2013.  In actions that can only be described an unfair and biased NSU, Dean Bridgmon and Ms. Keller, with no new facts related to the criteria being evaluated, sixteen (16) days later decided not to renew his contract.

74.     However, between February 11, 2013 and February 27, 2013, Plaintiff Madden's level of scholarship could not have changed.  If his scholarship was satisfactory on February 11, 2013, the sudden change in its acceptability based on no new facts is a violation of Plaintiff Madden's Due Process rights.

75.     It is the policy and practice of the University to indeed retain those individuals who receive evaluations and recommendations from the chair of their department that they be retained.  After receiving the affirmative recommendation from the chair of his department, Ms. Keller, Plaintiff Madden held an explicit mutual understanding with the University that supports his claim of entitlement to the benefit of retention for at least the next year.

76.     Plaintiff Madden was singled out for discriminatory treatment on an irrational and wholly arbitrary basis motivated by Dean Bridgmon and Ms. Keller's spiteful effort to punish and get rid of Plaintiff Madden for reasons wholly unrelated to any legitimate state objective.

77.     The acts of NSU, RUSO, Dean Bridgmon and Ms. Keller violated Plaintiff Madden's Fourteenth Amendment right to Due Process.

78.     As a direct and proximate cause of the University's, Dean Bridgmon's, RUSO's and Ms. Keller's actions, Plaintiff Madden has suffered economic damages in an amount not less than $1,000,000.00.

79.     Pursuant to 42 U.S.C. § 1983, Plaintiff Madden is entitled to recover a money judgment for his economic damages, judgment for his attorney's fees and costs incurred and

punitive damages.   Plaintiff Madden is further entitled to such injunctive and equitable relief as the Court deems just and proper.

### (ii)
### Arbitrary and Capricious Conduct

80.     Plaintiff hereby incorporates paragraphs 1 through 79.

81.     The Due Process and Equal Protection Clauses also prohibit arbitrary and capricious governmental decision-making in hiring, retaining, or applying one standard for some applicants and another standard for others.

82.     In this case, the University accepted and retained some faculty with scholarship levels equal to or less than Plaintiff Madden's scholarship, unequally applying standards between Plaintiff Madden and other professors.

83.     In this case, Plaintiff Madden met the scholarship criteria for retention and then sixteen (16) days later, his level of scholarship was used as grounds to refuse to retain him.

84.     Other faculty members who were retained, or even promoted and given tenure, had scholarship on level or below that of Plaintiff Madden.

85.     In this case, the University applied differing standards as to collegiality when it continued to retain faculty members who had been the target of multiple student complaints and petitions regarding their classroom demeanor and collegiality.

86.     The acts of NSU, Dean Bridgmon and Ms. Keller are suspect in timing, as a departure from normal procedures and are unexplainable on other grounds.

87.     Plaintiff Madden was singled out for discriminatory treatment on an irrational and wholly arbitrary basis motivated by Dean Bridgmon and Ms. Keller's spiteful effort to punish and get rid of Plaintiff Madden for reasons wholly unrelated to any legitimate state objective.

88.     The acts of NSU, RUSO, Dean Bridgmon and Ms. Keller were intentional violations of Plaintiff Madden's Fourteenth Amendment rights to Equal Protection under the law.

89.     As a direct and proximate cause of the University's, Dean Bridgmon's, RUSO's and Ms. Keller's actions, Plaintiff Madden has suffered economic damages in an amount not less than $1,000,000.00.

90.     Pursuant to 42 U.S.C. § 1983, Plaintiff Madden is entitled to recover a money judgment for his economic damages, judgment for his attorney's fees and costs incurred and punitive damages.   Plaintiff Madden is further entitled to such injunctive and equitable relief as the Court deems just and proper.

### (iii)
### Neutral and Detached Decision Makers

91.     Plaintiff hereby incorporates paragraphs 1 through 90.

92.     To ensure the governmental processes are fair and impartial, government decision makers must be neutral and detached.

93.     Dean Bridgmon was anything but detached when he made the decision not to retain Plaintiff Madden as a result of his criticism of Dean Bridgmon and the University's violation of the anti-nepotism policy.

94.     Ms. Keller was anything but detached when she facilitated Dean Bridgmon in mounting a retaliation campaign against Plaintiff Madden.   Since assisting Dean Bridgmon in discharging Plaintiff Madden, Ms. Keller has been promoted.

95.     Plaintiff Madden was singled out for discriminatory treatment on an irrational and wholly arbitrary basis motivated by Dean Bridgmon and Ms. Keller's spiteful effort to punish and get rid of Plaintiff Madden for reasons wholly unrelated to any legitimate state objective.

96.     The acts of NSU, RUSO, Dean Bridgmon and Ms. Keller were intentional violations of Plaintiff Madden's Fourteenth Amendment rights to Equal Protection under the law.

97.     As a direct and proximate cause of the University's, Dean Bridgmon's, RUSO's and Ms. Keller's actions, Plaintiff Madden has suffered economic damages in an amount not less than $1,000,000.00.

98.     Pursuant to 42 U.S.C. § 1983, Plaintiff Madden is entitled to recover a money judgment for his economic damages, judgment for his attorney's fees and costs incurred and punitive damages.   Plaintiff Madden is further entitled to such injunctive and equitable relief as the Court deems just and proper.

### (iv)
### Sound Review Procedures

99.     Plaintiff hereby incorporates paragraphs 1 through 98.

100.    At the very least, the University owes its faculty transparency and honesty in its review process.  Plaintiff Madden can only assume that the University did, in fact, provide both transparency and honesty in its review process on February 11, 2013, thus making this new trumped up claim of failure to meet the scholarship requirements and non-collegiality faulty at best, and very likely a fraudulent attempt to support its illegal actions.

101.    If the University, Dean Bridgmon, Ms. Keller, or others believed that Plaintiff Madden's scholarship warranted non-retention and that he was sufficiently non-collegiate as to warrant non-retention, they would have done well to document these views contemporaneously.

102.    Procedures allowing for a change in evaluation from "meets criteria" to a failure sufficient to warrant non-retention are highly questionable as they allow for the type of targeting that occurred in Plaintiff Madden's case.

103.    The process and procedure for review and retention was changed and applied unequally to Plaintiff Madden in an arbitrary and discriminatory manner for his outspoken views and unpopular criticism of the University's acts and policies.

104.    Plaintiff Madden was singled out for discriminatory treatment on an irrational and wholly arbitrary basis motivated by Dean Bridgmon and Ms. Keller's spiteful effort to punish and get rid of Plaintiff Madden for reasons wholly unrelated to any legitimate state objective.

105.    The acts of NSU, RUSO, Dean Bridgmon and Ms. Keller were intentional violations of Plaintiff Madden's Fourteenth Amendment rights to Due Process and Equal Protection under the law.

106.    As a direct and proximate cause of the University's, Dean Bridgmon's, RUSO's and Ms. Keller's actions, Plaintiff Madden has suffered economic damages in an amount not less than $1,000,000.00.

107.    Pursuant to 42 U.S.C. § 1983, Plaintiff Madden is entitled to recover a money judgment for his economic damages, judgment for his attorney's fees and costs incurred and punitive damages.   Plaintiff Madden is further entitled to such injunctive and equitable relief as the Court deems just and proper.

## CONCLUSION

A public university with state actors employed for the benefit of the public cannot be permitted to violate rights guaranteed by the First Amendment and the Due Process and Equal Protection Clause of the Fourteenth Amendment.   There are no compelling, important, or legitimate state interests that would justify the University's, Dean Bridgmon's, RUSO's and Ms. Keller's actions with respect to the violations of Plaintiff Madden's First Amendment rights to

free speech and his Fourteenth Amendment rights to due process and equal protection under the law.

Individual Defendants Dean Bridgmon and Ms. Keller, individually and in their official capacities and under color of law, acted willfully, wantonly, and maliciously in disregard of Plaintiff Madden's constitutional rights and with callous and/or reckless indifference to Plaintiff Madden's constitutional rights and accordingly, Defendants should be punished by the award of punitive damages against them in addition to the other relief requested.

PRAYER

WHEREFORE, Plaintiff prays for judgment against Defendants in their official and individual capacities, for compensatory damages in an amount equal to his past and future lost income and lost benefits in an amount as proved at trial, all economic losses on all claims allowed by law and punitive damages on all claims allowed by law in an amount to be determined at trial, and injunctive and equitable relief.

Plaintiff also requests recovery of his costs, expenses, and attorney's fees in accordance with 42 U.S.C. § 1983, 1983a and § 1988.

Respectfully submitted,

THE LAW OFFICE OF MCLAINE DEWITT HERNDON, P.L.L.C.

s/  McLaine DeWitt Herndon
McLaine DeWitt Herndon, OBA No. 20674
320 South Boston Avenue, Suite 1026
Tulsa, OK  74103
(918) 595-3337 – *Telephone*
(918) 289-2612– *Facsimile*
mclaine@mdhok.com
*Attorney for Plaintiff*