IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF OKLAHOMA

DAVID P. MADDEN,                              )
                                             )
          Plaintiff,                         )
                                             )
v.                                           )          Case No. CIV-13-393-HE
                                             )
REGIONAL UNIVERSITY SYSTEM OF                )
OKLAHOMA, a State of Oklahoma                )
constitutionally created governing board;    )
NORTHEASTERN STATE UNIVERSITY,               )
a public university; CARI KELLER, an         )
individual (in her individual and official   )
capacity); PHILLIP BRIDGMON, an              )
individual (in his individual and official   )
capacity),                                   )
                                             )
          Defendants.                        )

## PLAINTIFF'S RESPONSE TO MOTION TO DISMISS

Respectfully submitted,

THE LAW OFFICE OF MCLAINE DEWITT HERNDON,
P.L.L.C

s/  McLaine DeWitt Herndon
McLaine DeWitt Herndon, OBA No. 20674
320 South Boston Avenue, Suite 1026
Tulsa, OK  74103
(918) 585-3337 – *Telephone*
(918) 289-2612– *Facsimile*
mclaine@mdhok.com
*Attorney for Plaintiff*

# TABLE OF CONTENTS

RESPONSE TO DEFENDANTS' STATEMENT OF THE CASE .................................... 1

ARGUMENT AND AUTHORITIES ................................................................................. 3

STANDARD OF REVIEW ............................................................................................... 3

I.  RUSO, NSU, KELLER AND BRIDGMON HAVE NO ELEVENTH AMENDMENT IMMUNITY. ................................................................................. 4

    1.  RUSO is an independent, powerful, body corporate as well as a constitutionally created entity given plenary power to govern NSU. ........... 5

    2.  RUSO is unique in its organization and creation with powers identical to those of a county or municipality, neither of which have Eleventh Amendment immunity. ................................................................................. 6

    3.  RUSO is uniquely created and given authority under the Oklahoma Constitution, exercises independence in issuance of bonds and has been held to have extensive autonomy from the State and other agencies and is like the school board in *Mt. Healthy*. ................................. 12

    4.  Okla. Stat. tit. 70, § 3510(n) (1991) constitutes consent to be sued in Federal Court for violations of the Board's policies. ................................. 12

II.  KELLER AND BRIDGMON LACK ELEVENTH AMENDMENT IMMUNITY IN THEIR OFFICIAL AND INDIVIDUAL CAPACITIES. .......... 15

    1.  Keller and Bridgmon have no Eleventh Amendment immunity in their official capacities. ......................................................................................... 15

    2.  Keller and Bridgmon have no Eleventh Amendment immunity in their individual capacities. ..................................................................................... 15

III.  AFTER HIS WRITTEN REVIEW, WHEN KELLER APPROVED HIS RETENTION AND CONTINUED EMPLOYMENT FOR 2013-2014, MADDEN HAD A LEGITIMATE EXPECTATION TO CONTINUED EMPLOYMENT. ..................................................................................................... 16

IV.  MADDEN ADEQUATELY STATES A CLAIM FOR EQUAL PROTECTION. ................................................................................................... 18

V.  DEFENDANTS VIOLATED THE ESTABLISHED CONSTITUTIONAL RIGHTS OF MADDEN AND HAVE NO QUALIFIED IMMUNITY. ............... 21

1.    Keller's and Bridgmon's conduct violated Plaintiff's Fourteenth Amendment rights which are clearly established........................................21

    a)    Keller's and Bridgmon's actions were a violation of Madden's clearly established right to due process............................................23

    b)    Keller's and Bridgmon's actions were a violation of Madden's clearly established right to equal protection....................................24

CONCLUSION...........................................................................................................25

# TABLE OF AUTHORITIES

## CASES

*Axson-Flynn v. Johnson*, 356 F.3d 1277 (10th Cir. 2004) ................................. 3, 21, 22, 25

*Banks v. Wolfe Cnty. Bd. of Educ.*, 330 F.3d 888 (6th Cir. 2003) ........................................ 21

*Barnthouse v. City of Edmond*, 2003 OK 42, 73 P.3d 840 ................................................... 16

*Bd. of Educ., Vici Pub. Sch., Indep. Sch. Dist. No. I-5, Dewey Cnty. v. Morris,* 1982
    OK 142, 656 P.2d 258 ....................................................................................... 17, 18

*Bd. of Regents of State Colleges v. Roth*, 408 U.S. 564 (1972) ................................ 16, 17, 23

*Bd. of Regents of Univ. of Okla. v. Baker*, 1981 OK 160, 638 P.2d 464 ................. 5, 6, 7, 11

*Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007) ............................................................. 4, 16

*Boddie v. Conn.*, 401 U.S. 371 (1971) ................................................................................... 23

*Bruner v. Baker*, 506 F.3d 1021 (10th Cir. 2007) .......................................................... 19, 20

*Burnett v. Mortgage Electric Registration Systems Inc.*, 706 F.3d 1231 (10th Cir.
    2013) ............................................................................................................................. 20, 22

*Clark v. Bd. of Educ. of I.S.D. No. 89*, 2001 OK 56, 32 P.3d 851 ..................................... 22

*Coleman v. Turpen,* 1982 10CIR 277, 697 F.2d 1341 ......................................................... 19

*Conley v. Gibson*, 355 U.S. 41 (1957) ............................................................................. 19, 20

*Connell v. Higginbotham*, 403 U.S. 207 (1971) ............................................................. 17, 23

*Conner v. Reinhard*, 847 F.2d 384 (7th Cir.1988) .............................................................. 19

*Cornforth v. Univ. of Okla. Bd. of Regents*, 2001 10CIR 950, 263 F.3d 1129 .................. 16

*Elwell v. Oklahoma, ex rel. Bd. of Regents of Univ. of Oklahoma*, CIV-10-1169-C,
    2011 WL 560455 (W.D. Okla. Feb. 8, 2011) aff'd, 693 F.3d 1303 (10th Cir.
    2012) cert. denied, 133 S. Ct. 1255 (2013) ................................................................... 4

*Estate of Crowell ex rel. Boen v. Bd. of Cnty. Comm'rs*, 2010 OK 5, 237 P.3d 134 ......... 15

*Fed. Lands Legal Consortium ex rel. Robart Estate v. United States*, 1999 10CIR
    1330, 195 F.3d 1190 ...................................................................................................... 18

*Fleming v. Upper Dublin Pub. Sch. Dist.*, 141 F.Supp. 813 (E.D. Pa. 1956) ...................... 7

*Hope v. Pelzer*, 536 U.S. 730 (2002) .................................................................................... 22

*Keifer & Keifer v. Reconstruction Fin. Corp.*, 306 U.S. 381 (1939) ............................. 7, 11

*Khalik v. United Air Lines*, 671 F.3d 1188 (10th Cir. 2012) ........................................ 20, 22

*Lee v. Nicholl*, 1999 10CIR 1479, 197 F.3d 1291 ....................................................... 22, 25

*Lincoln Cnty. v. Luning*, 133 U.S. 529 (1890) ...................................................................... 7

*Monell v. Dep't of Soc. Servs.*, 436 U.S. 658 (1978)..........................................................15

*Mt. Healthy City School Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274 (1977)....................5, 12

*Muscogee (Creek) Nation v. Okla. Tax Comm'n,* 611 F.3d 1222 (10th Cir. 2010)..............3

*N.M. Paterson & Sons, Ltd. v. City of Chicago*, 176 F.Supp. 323 (N.D. Ill. 1959) ..............7

*Neitzke v. Williams*, 490 U.S. 319 (1989)..........................................................................4

*New Jersey Turnpike Authority v. Parsons*, 69 A.2d 875 (N.J. 1949) ................................8

*Nichols v. Dep't of Corr.*, 1981 OK 83, 631 P.2d 746 ......................................................14

*Patsy v. Bd. of Regents*, 457 U.S. 496 (1982)...................................................................13

*Perry v. Sindermann*, 408 U.S. 593 (1972) .......................................................................18

*Randolph v. Bd. of Regents of Okla. Colls.*, 1982 OK 75, 648 P.2d 825 ............................6

*Ruiz v. McDonnell,* 299 F.3d 1173 (10th Cir. 2002) ...........................................................4

*S.J. Groves & Sons Co. v. New Jersey Tpk. Auth.*, 268 F.Supp. 568 (D.N.J. 1967)7, 8, 9, 11

*Scheuer v. Rhodes*, 416 U.S. 232 (1974) ............................................................................4

*Seibert v. State of Okla. ex rel. Univ. of Okla. Health Scis. Ctr.*, 1989 10CIR 47, 867
   F.2d 591, *abrogated by Fed. Lands Legal Consortium ex rel. Robart Estate
   v. United States*, 1999 10CIR 1330, 195 F.3d 1190 ....................................5, 13, 14

*Smith v. E. New Mexico Med. Ctr.*, 1995 10CIR 1637, 72 F.3d 138...................................19

*Snell v. Tunnell,* 1990 10CIR 492, 920 F.2d 673 ..............................................................19

*State ex rel. Bd. of Regents of Okla. State Univ. v. Okla. Merit Prot. Comm'n*, 2001
   OK 17, 19 P.3d 865 ..............................................................................................6

*Swierkiewicz v.  Sorema N. A.*, 534 U.S. 506 (2002) ...........................................................4

*Vill. of Willowbrook v. Olech*, 528 U.S. 562 (2000) ..............................................18, 20, 24

*West v. Atkins,* 487 U.S. 42 (1988) ...................................................................................19


**STATUTES**

42 U.S.C.A. § 1983 (1996) ......................................................................................passim

Okla. Stat. tit. 11, § 22-101 (1978)....................................................................................10

Okla. Stat. tit. 19, § 1 (1986) ...............................................................................................9

Okla. Stat. tit. 70, § 3509 (1983) ......................................................................................10

Okla. Stat. tit. 70, § 3510 (1991) .............................................................................2, 10, 13

Okla. Stat. tit. 70, § 3510(n) (1991)...................................................................................12

Okla. Stat. tit. 70, § 4002 (2000) ....................................................................... 11

Okla. Stat. tit. 70, § 4004 (1973) ....................................................................... 11

Okla. Stat. tit. 70, § 6-103(B) (repealed by laws 1989, 1st Ex. Sess., c.2, § 122,
  operative July 1, 1990) ............................................................................ 18

Okla. Stat. tit. 74, § 85.58A(l) (2013) ................................................................ 13

## OTHER AUTHORITIES

Fed. R. Civ. P. 12(b)(1) (2009) ............................................................................ 3

Fed. R. Civ. P. 12(b)(6) (2009) ...................................................................... 4, 16

Okla. Const. art. XIII-A, § 1 ................................................................................. 5

Okla. Const. art. XIII-A, § 2 ................................................................................. 5

Okla. Const. art. XIII-B ...................................................................................... 10

Okla. Const. art. XIII-B, § 1 ................................................................................. 5

Okla. Const. art. XIII-B, § 2 ................................................................................. 5

U.S. Const. Amend. XIV .................................................................................... 18

COMES NOW Plaintiff, David P. Madden ("Madden"), by and through his attorney of record, McLaine DeWitt Herndon, and responds to Defendants' Motion to Dismiss as follows:

## RESPONSE TO DEFENDANTS' STATEMENT OF THE CASE

Madden started working for Northeastern State University ("NSU") as an adjunct professor in 2008. After working as an adjunct for several months, Madden received a letter dated November 20, 2009 from Don Betz, the President of NSU. The letter stated the board of the Regional University System of Oklahoma ("RUSO") had confirmed his employment as an Assistant Professor of Criminal Justice at NSU, which was a "full-time, tenure track appointment." The letter further stated Madden's employment was "subject to all of the rules and regulations of the Regional University System of Oklahoma, the laws and constitutions of Oklahoma and the United States, and policies adopted by the University." From November 20, 2009 until February 27, 2013 when he was terminated, Madden was a tenure track professor at NSU in Tahlequah, Oklahoma.

On February 11, 2013, Madden had his formal annual review with Cari Keller ("Keller"), the Department Chair of the Criminal Justice Program. Madden was told at that meeting and on paper that he would be retained for the 2013-2014 academic year. On the form signed by Keller, she circled "Retention" and marked that Madden "exceeds criteria" in the areas of "teaching" and "professional/university service," and "meets criteria" in the areas of "scholarship" and "collegiality and professionalism." This changed when, on February 27, 2013, Dean Bridgmon ("Bridgmon") told Madden he did not meet the scholarship and collegiality requirements and that his contract would not be renewed. Defendants' footnote one in their Motion to Dismiss purports to address the

timing of the evaluation by Keller and the termination by Bridgmon; however, the footnote is incorrect and incomprehensible as written.

Defendants claim that RUSO, NSU, Keller and Bridgmon (in their official capacities) have Eleventh Amendment immunity.[1]  However, RUSO is more like a political subdivision.  It is a Constitutionally created independent governing body set up to govern its Universities, including NSU.  It is not a statutorily created entity and as the Oklahoma Supreme Court has pointed out, the powers conferred upon Constitutional versus statutory universities and boards of regents vary greatly.  Moreover, Oklahoma consented to suit and waived RUSO's Eleventh Amendment immunity under Okla. Stat. tit. 70, § 3510 incorporated into RUSO's Policy Manual.  Under a proper analysis, and regardless of the capacity in which they are sued, none of the Defendants has Eleventh Amendment immunity.

Defendants argue Plaintiff has failed to state due process and equal protection claims against Defendants.  However, on February 11, 2013, all parties had a mutual understanding that Madden would be retained which created a legitimate property interest in continued employment with NSU.  Sixteen (16) days after being told he would be retained, Bridgmon fired Madden saying Madden did not meet the criteria for retention.  This reversal of the University's position and Madden's termination was arbitrary and capricious as well a malicious and intentional.  Bridgmon was the person who reversed the University's position[2] and decided to change the evaluation.  Bridgmon was angry at Madden for speaking out about pressure being placed on the Political Science Department

---

[1] Sovereign immunity does not and has never protected state employees sued for constitutional violations in their individual capacities.  As such, Keller and Bridgmon have no Eleventh Amendment immunity in their individual capacities.

[2] Until the day of his termination, Madden had never spoken to Bridgmon.

hiring committee to hire Bridgmon's wife. Madden had stated that he believed this was a violation of RUSO's anti-nepotism policy, and on February 18, 2013, Keller reprimanded Madden for his statements, telling him that it was not his job to interpret University policy. Madden, Keller and NSU established a mutual expectation in continued employment which Madden was denied in violation of his due process rights. Further, the arbitrary, capricious and malicious actions of Keller and Bridgmon were violations of Madden's right to equal protection.

Defendants Keller[3] and Bridgmon have no qualified immunity. "Qualified immunity shields public officials from section 1983 liability 'unless their actions' violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Axson-Flynn v. Johnson*, 356 F.3d 1277, 1299 (10th Cir. 2004). Public employees' First[4] and Fourteenth Amendment rights at issue here are "clearly established," and in light of preexisting law, the unlawful actions of Keller and Bridgmon are apparent. As such, they have no qualified immunity for their actions.

<u>**ARGUMENT AND AUTHORITIES**</u>

<u>**Standard of review**</u>

Under Rule 12(b)(1), a motion to dismiss for lack of subject matter jurisdiction may take the form of either a facial attack or a factual attack. See *Muscogee (Creek) Nation v. Okla. Tax Comm'n,* 611 F.3d 1222, 1227 & n.1 (10th Cir. 2010). A facial attack challenges the court's jurisdiction by looking only to the factual allegations of the complaint. *Elwell v. Oklahoma, ex rel. Bd. of Regents of Univ. of Oklahoma*, CIV-10-

---

[3] Certainly the Chair of the Criminal Justice Program, who is a lawyer herself, is aware of First and Fourteenth Amendment rights.

[4] Defendants' Keller and Bridgmon assert no qualified immunity to Madden's First Amendment claims and have thus waived this defense to his First Amendment claims.

1169-C, 2011 WL 560455 (W.D. Okla. Feb. 8, 2011) <u>aff'd,</u> 693 F.3d 1303 (10th Cir. 2012) <u>cert. denied,</u> 133 S. Ct. 1255 (2013). Here, Defendant challenges the Court's jurisdiction based only on the factual allegations of the Complaint and not on any additional evidence. Accordingly, Defendant facially attacks the Court's jurisdiction over Plaintiff's claims, and, therefore, <u>the Court must look to and accept as true the Complaint's factual allegations</u>. *Ruiz v. McDonnell,* 299 F.3d 1173, 1180 (10th Cir. 2002) (emphasis added).

A Motion to Dismiss under Rule 12(b)(6) proceeds on the assumption that all the allegations in the complaint are true (even if doubtful in fact). *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555-56, (2007); *see, e.g., Swierkiewicz v. Sorema N. A.*, 534 U.S. 506, 508, n. 1 (2002); *Neitzke v. Williams*, 490 U.S. 319, 327, 109 (1989) ("Rule 12(b)(6) does not countenance ... dismissals based on a judge's disbelief of a complaint's factual allegations"); *Scheuer v. Rhodes*, 416 U.S. 232, 236, (1974) (a well-pleaded complaint may proceed even if it appears "that a recovery is very remote and unlikely").

## I. RUSO, NSU, KELLER AND BRIDGMON HAVE NO ELEVENTH AMENDMENT IMMUNITY.

State agencies that are purely an arm of the state are not considered persons for suit under 42 U.S.C.A. § 1983 (1996). Municipalities and political subdivisions are subject to suit and do not have Eleventh Amendment immunity. RUSO is more like a political subdivision than an arm of the state. NSU, as well as Keller and Bridgmon, are completely subject to the control of RUSO, an "independent governing board." As the Oklahoma Supreme Court stated, "Oklahoma is one of only a few states in which the legal status of public universities is constitutional rather than statutory. Among these jurisdictions, constitutional provisions relating to the power of university officials differ substantially,

and we have found none identical to our own." *Bd. of Regents of Univ. of Okla. v. Baker*, 1981 OK 160, 638 P.2d 464, 467.[5]

Madden respectfully requests this Court review the extent to which the legislature intended to separate out and provide plenary governing power to RUSO; the extent to which the powers of counties, municipalities and RUSO are identical; the extent to which the factors set forth in *Mt. Healthy City School Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274 (1977) are present in this case; and the extent to which the consent to suit provisions combined with the establishment of the insurance fund demonstrate that RUSO is more like a political subdivision with no Eleventh Amendment immunity.

1.      **RUSO is an independent, powerful, body corporate as well as a constitutionally created entity given plenary power[6] to govern NSU.**

Defendants incorrectly state that RUSO is a State of Oklahoma statutorily created governing board. RUSO is a constitutionally created governing body expressly granted the authority to govern, among other Universities, NSU. "All institutions of higher education supported wholly or in part by direct legislative appropriations shall be integral parts of a unified system to be known as 'The Oklahoma State System of Higher Education.'" Okla. Const. art. XIII-A, § 1. RUSO is a constitutional entity "which stands empowered by . . . , Art. 13-A §§ 1 and 2 as well as Art. 13-B §§ 1 and 2, Okla. Const., to conduct the internal affairs of their subordinate institutions of higher learning free of any interference by" any

---

[5] Madden is aware of the holding in *Seibert v. State of Okla. ex rel. Univ. of Okla. Health Scis. Ctr.*, 1989 10CIR 47, 867 F.2d 591, 592, *abrogated by Fed. Lands Legal Consortium ex rel. Robart Estate v. United States*, 1999 10 CIR 1330, 195 F.3d 1190, and respectfully asserts that the full extent to which the Oklahoma legislature intended entities such as RUSO to be separate governing bodies and the impact of this delegation on RUSO's Eleventh Amendment immunity may not have been fully considered.

[6] See *Baker*, 1981 OK 160, 638 P.2d at 466, fn.2 (addressing "plenary" power granted to Oklahoma Boards and Universities via Constitutional creation and provisions).

other agency. *State ex rel. Bd. of Regents of Okla. State Univ. v. Okla. Merit Prot. Comm'n*, 2001 OK 17, 19 P.3d 865-866. "The Legislature is powerless to delegate [RUSO's] constitutional control over the management of their institutions to any department, commission or agency of state government." *Id*. RUSO, solely vested with the governance of NSU, is responsible for autonomously setting University policies, issuing bonds, holding property, contracting, establishing rights and providing redress for violations of those policies and rights.

> There can be no question but that the Board of Regents has all power necessary to accomplish the objects it was constitutionally empowered to achieve and is therefore authorized to enact rules, regulations and bylaws for the good government and management of the university and its every department.

*Randolph v. Bd. of Regents of Okla. Colls.*, 1982 OK 75, 648 P.2d 825, 827 (citations omitted).

> The Oklahoma Supreme Court recognized this power, stating
>
> [w]hile the law-making power of the Legislature is supreme within its proper sphere, that power may be restricted and limited by constitutional provisions. Limitations on legislative authority may be implied as well as expressed in the Constitution. Every positive delegation of power by the Constitution to one officer or department of government implies a negation of its exercise by any other officer or department.

*Baker*, 638 P.2d at 466 (citations omitted). RUSO is an independent body both corporate and politic.

### 2. RUSO is unique in its organization and creation with powers identical to those of a county or municipality, neither of which have Eleventh Amendment immunity.

Oklahoma is one of very few states with the Constitutional rather than statutory setup. *Baker*, 1981 OK 160, 638 P.2d at 466. "We have no doubt that in elevating the status of the Board from a statutory to a constitutional entity the people intended to limit

legislative control over University affairs." *Id*. at ¶8, 467. RUSO is not an arm of the State but more like a political subdivision and should have no Eleventh Amendment immunity. Whether an entity is an arm of the State with Eleventh Amendment immunity or more like a political subdivision is a question of the state's delegation of power to the entity. "[T]he mere fact that an entity may properly be described as an 'agency of the state' or that it does the work of the state does not qualify it for immunity." *N.M. Paterson & Sons, Ltd. v. City of Chicago*, 176 F.Supp. 323, 324 (N.D. Ill. 1959) (citing *Keifer & Keifer v. Reconstruction Fin. Corp.*, 306 U.S. 381, 388 (1939)).

> While the application of the Eleventh Amendment is a question of federal law, nevertheless, the answer to that question, as to whether a particular state agency is entitled to immunity from federal jurisdiction, must depend upon the characteristics, capacities, powers and immunities of such agency as they are defined by the law of the State.

*Fleming v. Upper Dublin Pub. Sch. Dist.*, 141 F.Supp. 813, 813 (E.D. Pa. 1956). Taken together, these two quotes clearly demonstrate that identifying an entity is an "agency of the state" is not dispositive of whether that entity has immunity but rather it is the delegation of powers and authority to the entity that counts. <u>This Court here must not elevate form over function in deciding whether the Defendants have Eleventh Amendment immunity</u>.

"Counties and municipalities do not partake of the Eleventh Amendment immunity enjoyed by the States." *S.J. Groves & Sons Co. v. New Jersey Tpk. Auth.*, 268 F.Supp. 568, 574 (D.N.J. 1967) (citing *Lincoln Cnty. v. Luning*, 133 U.S. 529 (1890)). In *S.J. Groves* the New Jersey Turnpike Authority was sued by a Minnesota company for breach of contract. The Turnpike Authority mounted the defense that it was an "alter ego" of the state and enjoyed Eleventh Amendment immunity. *Id*. at 570. The Turnpike Authority

was not a municipal or county entity and was clearly an entity created by the powers of and to serve the State of New Jersey.

In its analysis the court stated determining "[w]hether other bodies come under the Amendment depends on their relationship to the State, on the powers and responsibilities, the attributes and limitations, with which they have been endowed." *S.J. Groves*, 268 F.Supp. at 574. In other words, it depends on the power delegated to the entity. In determining that the New Jersey Turnpike Authority was an independent public authority with <u>no</u> Eleventh Amendment immunity, the *S.J. Groves* Court stated:

> <u>The New Jersey Turnpike is an independent public authority, combining certain attributes common to State executive departments, on the one hand, with qualities common to municipal or private corporations, on the other.</u> Created to improve vehicular traffic by the construction of modern expressways, New Jersey Turnpike Authority Act, N.J.S.A. 27:23-1, et seq., **it exercises a number of powers free of any substantial legislative supervision. It may issue revenue bonds, payable from tolls and other revenues of the Authority** (Sec. 1) . . . . **The Authority is also empowered to set tolls; to enter contracts in its own name; to sue and be sued; to construct, repair and operate turnpike projects; to acquire property by purchase or otherwise**, . . . also in its own name; **and to hire professional and other employees, not carried on the State payroll** nor subject to the general Civil Service for State employees (N.J.S.A. 11). (Sec. 5). **The Authority is composed of three members, appointed by the Governor with the consent of the Senate. As such, they constitute a 'body corporate and politic'** established in the State Highway Department. . . .

*Id.* at 574-75 (emphasis added). Additionally, in making its determination the *S.J. Groves* Court considered the holding in *New Jersey Turnpike Authority v. Parsons*, which challenged the constitutionality of the establishment of the Authority in the first place. 69 A.2d 875 (N.J. 1949). *Parsons* held that the creation of the Authority was not unconstitutional emphasizing that the fact that "the Authority's bonds were disengaged from the State treasury by express provision that they are not a debt or a liability or a

pledge of faith and credit of the State," was key in their analysis. The court went on to state:

> In summary, New Jersey has created a public Corporation with substantial fiscal and managerial autonomy and has insulated the State treasury from the Authority's obligations and liabilities. The Authority acquires property, enters contracts and sues on its own behalf, but for organizational purposes it is pigeonholed in the State Highway Department. That it performs an essential governmental function as an instrumentality of the State is not disputed. … In light of all these factors, the Authority is not protected by the Eleventh Amendment as a matter of Federal law.

*S.J. Groves*, 268 F.Supp. at 578. This same analysis is applicable to RUSO, which should be held to have no Eleventh Amendment immunity.

Oklahoma counties and Oklahoma municipalities, which have no Eleventh Amendment immunity, have powers almost identical to those of RUSO. According to Okla. Stat. tit. 19, § 1 (1986) governing the powers of Oklahoma counties:

> Each organized county within the state shall be <u>a body corporate and politic</u> and as such shall be empowered for the following purposes:
>
> 1. **To sue and be sued**;
> 2. **To purchase and hold real and personal estate for the use of the county**, and lands sold for taxes as provided by law;
> 3. **To sell and convey any real or personal estate owned by the county**, and make such order respecting the same as may be deemed conducive to the interests of the inhabitants;. . .
> 5. **To make all contracts and do all other acts in relation to the property and concerns of the county necessary to the exercise of corporate or administrative power**; and
> 6. **To exercise such other and further powers as may be especially provided for by law**.

(Emphasis added.) Oklahoma municipalities have the same autonomy and powers, and no Eleventh Amendment immunity.

> All incorporated municipalities shall be <u>bodies corporate and politic</u>, and shall have the powers to:
>
> 1. **Sue and be sued**;

9

2. **Purchase and hold real and personal property** for the use of the municipality;
3. **Sell and convey any real or personal property owned** by the municipality and make orders respecting the same as may be conducive to the best interests of the municipality;
4. **Make all contracts** and do all other acts in relation to the property and affairs of the municipality, **necessary to the good government of the municipality, and to the exercise of its corporate and administrative powers**; and
5. **Exercise such other powers as are or may be conferred by law**.

Okla. Stat. tit. 11, § 22-101 (1978) (emphasis added). Likewise RUSO, "The Board of Regents of Oklahoma Colleges created by Article XIII-B of the Constitution of Oklahoma <u>shall be a body corporate</u> and"

shall have the supervision, management and control of . . . Northeastern State University,; and it shall have the following additional powers and duties:
(a) **Adopt such rules and regulations as it deems necessary to govern each of the institutions under its jurisdiction**. . . .
(c) **Enter into contracts**, . . . **as may be necessary to make any of its powers effective**. . . .
(h) **Acquire and take title to real and personal property in its name,** on behalf of any of the institutions under its jurisdiction, and convey, **exchange or dispose of, or otherwise manage or control, such property in the interest of such institutions, including the granting of leases, permits, easements and licenses over or upon any such real property**. . . **The Board shall have custody of abstracts of title and instruments affecting the ownership of or title to real property acquired for or belonging to such institutions**.
(n) **Provide penalties and forfeitures by way of damages and otherwise for the violation of rules and regulations of the Board, which may be sued for and collected in the name of the Board before any court having jurisdiction of such actions**.
(o) **Do all things necessary or convenient to carry out the powers expressly granted to it by Article XIII-B of the Constitution and the Statutes of Oklahoma, or to make institutions under its jurisdiction effective for the purposes for which they are maintained or operated**.

Okla. Stat. tit. 70, §§ 3509 & 3510 (emphasis added).

As to bond issuance, while it does obtain money from the State, RUSO is authorized to issue bonds in its name

> [f]or the purpose of paying all or part of the cost of acquisition of any such lands, rights-of-way, easements, licenses and permits and the construction, acquisition, equipment and furnishing of any such building or buildings or structure or structures, plants or systems, or of any additions, improvements or extensions thereto, or any additions to existing buildings.

Okla. Stat. tit. 70, § 4002 (2000). Further, RUSO is like the Turnpike authority in *S.J. Groves* in that RUSO has complete control over the manner and timing of repayment of those bonds, which are not considered an indebtedness of the State of Oklahoma. Okla. Stat. tit. 70, § 4004 (1973).

> "The fact remains that the legislature has a wide range of choice in constituting such bodies: it may fashion an agency as an integral part of the appropriate department in the Executive branch; or, for whatever reasons, it may prefer to establish an autonomous body, ultimately subject to political control but operating as an independent entity."

*S.J. Groves*, 268 F.Supp. at 579.

> Their designation in the enabling acts as 'arms' or 'instruments' of the State performing 'essential governmental functions' does not per se make them tantamount to the State within the Eleventh Amendment; 'the government does not become the conduit of its immunity in suits against its agents or instrumentalities merely because they do its work.'

*Id*. (emphasis added) (citing *Keifer & Keifer v. RFC*, 306 U.S. 381, 388 (1938) (Frankfurther, J.)). As the Oklahoma Supreme Court pointed out, Oklahoma is one of very few states with the Constitutional rather than statutory setup. *Baker*, 1981 OK 160, 638 P.2d at 466. "We have no doubt that in elevating the status of Board from a statutory to a constitutional entity the people intended to limit legislative control over University affairs." *Id*. at 467. Oklahoma delegated plenary powers and duties to RUSO and RUSO has total control over the other Defendants. The Legislature can alter the same going

forward but that will not change what they are now. As such, Defendants' Motion to Dismiss asserted on the basis of Eleventh Amendment immunity should be denied.

3. **RUSO is uniquely created and given authority under the Oklahoma Constitution, exercises independence in issuance of bonds and has been held to have extensive autonomy from the State and other agencies and is like the school board in *Mt. Healthy*.**

In *Mt. Healthy*, the question was

whether the Mt. Healthy Board of Education is to be treated as an arm of the State partaking of the State's Eleventh Amendment immunity, or is instead to be treated as a municipal corporation or other political subdivision to which the Eleventh Amendment does not extend. The answer depends, at least in part, upon the nature of the entity created by state law.

429 U.S. at 280. Likewise here, RUSO is uniquely created and vested with broad ranging powers to hold, sell and dispose of real property, enter into contracts, authorize and issue bonds. RUSO should be considered more like a political subdivision rather than an arm of the State. Based on the uniqueness of its creation, its authority to raise revenue and issue bonds, *Mt. Healthy* held that despite guidance from the State Board of Education and the significant amount of state revenue it received,

[o]n balance, the record before us indicates that a local school board such as petitioner is more like a county or city than it is like an arm of the State. We therefore hold that it was not entitled to assert any Eleventh Amendment immunity from suit in the federal courts.

*Id.* at 280-81. Likewise, RUSO should be held to have no Eleventh Amendment immunity.

4. **Okla. Stat. tit. 70, § 3510(n) constitutes consent to be sued in Federal Court for violations of the Board's policies.**

Oklahoma consented to suit in Federal Court against RUSO and its constituent parts and employees when it gave this very powerful entity the right to provide forfeitures by way of damages for the violation of rules and regulations of the Board, which may be sued

for and collected in the name of the Board <u>before any court having jurisdiction of such actions</u>. *See* Okla. Stat. tit. 70, § 3510 (1991).[7] This statue, incorporated into the RUSO Policy Manual, does not state that suit may be brought in any court of competent jurisdiction, but rather that suit may be brought in any court having jurisdiction over such actions. In *Patsy v. Bd. of Regents*, 457 U.S. 496 (1982) the Supreme Court considered whether exhaustion of state administrative remedies was a prerequisite to an action under § 1983. In a concurring opinion agreeing that exhaustion was not a requirement, Justice White stated:

> In my view, this case does not present a serious Eleventh Amendment issue. The Florida statute authorizing suits against the Board of Regents, Fla.Stat. § 240.205 (1981), is clear on its face. I see no reason to read a broad waiver to sue and be sued in "all courts of law and equity" as meaning all but federal courts. Nor am I aware of anything in Florida law that suggests a more limited meaning was intended than indicated by the unequivocal terms of the statute. <u>Certainly, none of our cases have gone so far as to hold that federal courts must be expressly mentioned for an effective Eleventh Amendment waiver</u>.

> Thus, while I do not object to the Court's leaving the Eleventh Amendment issue for further consideration by the lower courts-at least where, as here, there is no logical priority in resolving Eleventh Amendment immunity before exhaustion-I find the issue sufficiently clear to be answered here and now. **The statute means what it says.**

*Patsy*, 457 U.S. at 519 (White, J., concurring) (emphasis added). Here, too, the statute means what it says.

Further, Plaintiff has sued the <u>Board</u> of Regents. The Board of RUSO has an Officers and Directors Liability Policy. RUSO's policy manual provides "[p]ursuant to 74 O.S. § 85.58A(l) all [RUSO] employees acting within the course and scope of their employment are covered at state expense under the comprehensive professional risk management program administered by the Department of Central Services, subject to the

---

[7] Again, Madden is aware of the holding in *Seibert*; however, Madden's argument is not that in general suits by the State waived its immunity, but that with the specific Oklahoma statutes and RUSO policies it has specifically consented to this suit.

limitations of that program." Damages against the Board would be paid out of this insurance policy and not out of the state treasury. In *Nichols v. Dep't of Corr.*, 1981 OK 83, 631 P.2d 746, 748 the State's purchase of liability insurance did not waive the state's Eleventh Amendment immunity. However, this was at least partly because the statute at issue in *Nichols* applied to tort actions fell under the Oklahoma Government Tort Claims Act. Oklahoma expressly states in that statute that it does not waive its Eleventh Amendment immunity. The Tort Claims Act is not applicable here. The consent to suit that is applicable to RUSO appears in a separate statute and in the RUSO Policy Manual and is not in any way associated with the Oklahoma Government Tort Claims Act. Further, it does not contain any type of express or implied reservation of Eleventh Amendment immunity.

As Justice White states, statutes should be interpreted to mean what they say, i.e., that the Board can provide a forfeiture for damages accrued as a result of a violation of its policies in a Court having jurisdiction over that action. This Court has jurisdiction over claims under § 1983[8] and the Legislature's delegation of powers to RUSO serves to eliminate its Eleventh Amendment immunity. Further, the Board has Director and Officer liability insurance to pay for any damages, which will not be paid out of the State Treasury.

Madden respectfully suggests that despite the decisions in *Seibert* and other cases holding that RUSO and other Oklahoma Boards of Higher Education have Eleventh Amendment immunity, the constitutional establishment of RUSO, cases citing to the plenary power of this body politic and corporate, as well as the other statutes and case law cited herein warrants another look at this issue.

---

[8] The fact that a State can waive its Eleventh Amendment immunity dispels any argument that the Federal Courts have no jurisdiction to hear these suits. Further, the argument that RUSO is like a political subdivision with no Eleventh Amendment immunity forecloses an argument that this Court does not have jurisdiction over this suit.

## II. KELLER AND BRIDGMON LACK ELEVENTH AMENDMENT IMMUNITY IN THEIR OFFICIAL AND INDIVIDUAL CAPACITIES.

Because RUSO is more like a political subdivision than an arm of the state, Keller and Bridgmon have no Eleventh Amendment immunity. However, even if they have Eleventh Amendment immunity in their official capacities, they have been sued in their individual capacities and neither sovereign immunity nor the Eleventh Amendment protects state employees sued in their individual capacities for constitutional violations.

### 1. Keller and Bridgmon have no Eleventh Amendment immunity in their official capacities.

See Argument set forth supra at section I (1-4).

### 2. Keller and Bridgmon have no Eleventh Amendment immunity in their individual capacities.

Keller and Bridgmon have not claimed Eleventh Amendment immunity in their individual capacities and so have waived the same. They have claimed qualified immunity and that issue is addressed herein at section V.

"In an individual capacity suit under § 1983, a plaintiff seeks to impose personal liability on a state actor for actions taken under color of state law." *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 690 n.55 (1978). Here, Keller and Bridgmon have been sued in their individual capacities for their actions taken under color of law.

The Oklahoma Supreme Court and the Court of Civil Appeals have repeatedly authorized § 1983 actions to go forward against individual state employees without mentioning that sovereign immunity may be at issue. *See, e.g.*, *Estate of Crowell ex rel. Boen v. Bd. of Cnty. Comm'rs*, 2010 OK 5, 237 P.3d 134, 143 (allowing claim under § 1983 for constitutional violation to go forward against sheriff and individual jail

employees without discussing sovereign immunity); *Barnthouse v. City of Edmond*, 2003 OK 42, 73 P.3d 840, 849 (reversing summary judgment in favor of individual defendant in § 1983 claim on <u>qualified immunity</u> grounds and not discussing or applying <u>sovereign immunity</u> or the GTCA despite noting that individual defendant raised the issue).

Moreover, the Eleventh Amendment does not provide Keller and Bridgmon with immunity from suit.[9]  *See Cornforth v. Univ. of Okla. Bd. of Regents*, 2001 10 CIR 950, 263 F.3d 1129, 1132  ("As a general rule, suits seeking damages from state officials in their individual capacities are not barred by the Eleventh Amendment.")

**III.  AFTER HIS WRITTEN REVIEW, WHEN KELLER APPROVED HIS RETENTION AND CONTINUED EMPLOYMENT FOR 2013-2014, MADDEN HAD A LEGITIMATE EXPECTATION TO CONTINUED EMPLOYMENT.**

A Motion to Dismiss under Rule 12(b)(6) proceeds on the assumption that all the allegations in the complaint are true (even if doubtful in fact).  *Twombly*, 550 U.S. 555-556.  On February 11, 2013, Keller formally reviewed Madden, awarding him with on target "meets criteria" marks for both "scholarship" and "collegiality" and "exceeds criteria" for "teaching" and "University service."  Keller circled "Retained" indicating on the form that Madden would be retained.  Madden had a property interest when on February 11, 2013 Keller approved his retention and continued pursuit of tenure for 2013-2014**.**

On February 11, 2013, NSU created a mutual understanding between itself and Madden that he was being retained for the 2013-2014 academic year.  As pointed out by *Bd. of Regents of State Colleges v. Roth*, 408 U.S. 564, 577 (1972) "[o]nly last year, the Court held that this principle 'proscribing summary dismissal from public employment

---

[9] Neither Keller nor Bridgmon claim Eleventh Amendment immunity in their individual capacities and even if they had such immunity they have waived it by not asserting the same.

without hearing or inquiry required by due process' also applied to a teacher recently hired <u>without tenure or a formal contract</u>, but nonetheless with a clearly implied promise of continued employment." *Connell v. Higginbotham*, 403 U.S. 207, 208 (1971)." *Roth*, 408 U.S. at 577 (emphasis added). Keller and NSU's actions were a clearly implied understanding and promise of continued employment.

"To have a property interest in a benefit, a person clearly must have more than an abstract need or desire for it. He must have more than a unilateral expectation of it. He must, instead, have a legitimate claim of entitlement to it." *Roth*, 408 U.S. at 577. Every year for 3 years, Madden was reviewed by Keller, and her decision with respect to retention was fulfilled <u>without further action</u>. On February 11, 2013, there was every reason for Madden, NSU and Keller to have a legitimate expectation that Madden would continue in his position. In *Roth*, there was absolutely no action on the part of the University which would have supported re-employment for the next year. *Id*. at 578. The untenured professor in *Roth* was on a year contract which expired of its own terms without any action affirmatively or negatively by the University. *Id*. Here, NSU took affirmative steps to secure the continued employment of Madden and he had a legitimate expectation of the same. When he was denied those rights without a hearing and in a malicious manner just over two weeks later, his due process rights were violated.

Defendants argue that the review and notice provided by Keller were insufficient to create a property interest. However the cases cited by Defendant are easily distinguishable. In no case cited by the Defendant did a Plaintiff receive any formal or informal indication in their evaluations that they would be retained for the following school year. Defendants cite to *Bd. of Educ., Vici Pub. Sch., Indep. Sch. Dist. No. I-5, Dewey Cnty. v. Morris*, for the proposition that a school does not bind itself to a particular

employment decision based on evaluations.  1982 OK 142, 656 P.2d 258.[10]   Although the case states that the school was not bound to a decision based on evaluations, the Court was referring to a specific State statute that is not applicable here.  Specifically, they were referring to Okla. Stat. tit. 70, § 6-103(B) which provides:

> In determining whether the professional performance of a teacher is inadequate, consideration **may** be given to any written standards of performance which may have been adopted by the State Board of Education, or any education-oriented organization or agency.

(emphasis added).  This statute is not applicable to RUSO or the Plaintiff here. Defendants' argument that a non-tenured teacher has no due process rights is not supported by the facts here or applicable case law.  "We have made clear ... that 'property' interests subject to procedural due process protection <u>are not limited by a few rigid, technical forms</u>. Rather, 'property' denotes a broad range of interests that are secured by existing rules <u>or understandings</u>."  *Fed. Lands Legal Consortium ex rel. Robart Estate v. United States*, 1999 10CIR 1330, 195 F.3d 1190, 1196 (emphasis added) (*citing Perry v. Sindermann*, 408 U.S. 593 (1972)).

## IV.    MADDEN ADEQUATELY STATES A CLAIM FOR EQUAL PROTECTION.

The Equal Protection Clause, part of the Fourteenth Amendment to the United States Constitution, provides that "no state shall  ... deny to any person within its jurisdiction the equal protection of the laws."  U.S. Const. Amend. XIV.  The species of this claim by Madden is that which involves the "class-of-one" theory.  A "class-of-one" equal protection claim does not require Madden to be in a protected class, but rather only that he was irrationally, maliciously as well as unequally targeted.  *Vill. of Willowbrook v. Olech*, 528 U.S. 562, 564 (2000) ("Our cases have recognized successful equal protection claims brought by a 'class of one,' where the plaintiff alleges that she has been

---

[10]  In *Bd. Of Educ., Vici*, the superintendent who was seeking a reinstatement was not entitled to a hearing as he was not a teacher under Oklahoma state statutes.

intentionally treated differently from others similarly situated and that there is no rational basis for the difference in treatment.").[11]

"In order to state a § 1983 claim, a plaintiff must 'allege the violation of a right secured by the Constitution and laws of the United States, and must show that the alleged deprivation was committed by a person acting under color of state law.'" *Bruner v. Baker*, 506 F.3d 1021, 1025-26 (10th Cir. 2007) (citing *West v. Atkins,* 487 U.S. 42, 48, (1988)). "Section 1983 claims against public officials must demonstrate some form of personal involvement on the part of the individual defendants." *Id.* at 1026 (citing *Coleman v. Turpen,* 1982 10CIR 277, 697 F.2d 1341, 1346 n.7). "The plaintiff must show the defendants 'caused' the constitutional deprivation." *Id.* (citing *Snell v. Tunnell,* 1990 10CIR 492, 920 F.2d 673, 700). "This causal connection is shown if the defendants 'set in motion a series of events that the defendant[s] knew or reasonably should have known would cause others to deprive the plaintiff of [his] constitutional rights.'" *Id.* at 1026 (quoting *Conner v. Reinhard*, 847 F.2d 384, 396-97 (7th Cir.1988)). "A supervisor can also be held liable if the supervisor expressly 'authorized, supervised, or participated in conduct which caused the constitutional deprivation.'" *Id.*

The Tenth Circuit is clear that "a complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Smith v. E. New Mexico Med. Ctr.*, 1995 10CIR 1637, 72 F.3d 138 (citing *Conley v. Gibson*, 355 U.S. 41, 45-46 (1957) (footnote omitted)). In his Complaint, Madden stated that because of Bridgmon's animosity against Madden for speaking out about possible violations of the anti-nepotism policy, Bridgmon engaged in a calculated and malicious campaign to fire him. This

---

[11] Madden's focus in his Complaint on other individuals who were retained or promoted to tenure and whose scholarship fell well below that of Madden points to Bridgmon's pretext in stating that the non-retention was due to Madden's failure to meet scholarship requirements.

occurred after Madden's retention was acknowledged and approved by Keller. Further, Madden pointed out that other similarly situated individuals, namely Dr. Agnew, received no such similar treatment for engaging in this discussion. In *Village of Willowbrook,* the seminal case addressing the "class-of-one theory," the Court cited *Conley* and held that a plaintiff's "complaint can fairly be construed as alleging that the Village intentionally demanded a 33-foot easement as a condition of connecting her property to the municipal water supply where the Village required only a 15-foot easement from other similarly situated property owners." 528 U.S. at 565. Here, Madden states that he had discussions with several colleagues concerning the possible violations of the anti-nepotism policy and that he alone was singled out for malicious treatment and intentional targeting that occurred when Keller and Bridgmon revoked his retention.

On February 11, 2013, Madden was told that he met the criteria for retention. On February 27, 2013, when Bridgmon met with Madden to give him his non-renewal notice, Bridgmon told Madden that the decision was based on Madden's failure to fulfill the scholarship and collegiality requirements. This was "wholly arbitrary and lacking in legitimate justification and also had a concrete effect on [Madden's] rights." *Bruner*, 506 F.3d at 1029. Additionally, Madden has sufficiently plead that others similarly situated, namely Dr. Agnew for one, were not targeted and were not maliciously fired for exercising First Amendment rights. As stated above, indeed, Madden "is not required to set forth a prima facie case for each element" of his claims. *Khalik v. United Air Lines*, 671 F.3d 1188, 1193 (10th Cir. 2012). Rather, he must only set forth plausible claims "animating the elements of his causes of action." *Burnett v. Mortgage Electric Registration Systems Inc.*, 706 F.3d 1231, 1236 (10th Cir. 2013). He has stated both that he was singled out because of his exercise of his First Amendment rights and that he was maliciously and illegitimately targeted and fired by Keller and Bridgmon. Madden's equal protection claims should be sustained and Defendants' Motion to Dismiss denied in its entirety.

## V. DEFENDANTS VIOLATED THE ESTABLISHED CONSTITUTIONAL RIGHTS OF MADDEN AND HAVE NO QUALIFIED IMMUNITY.

Keller and Bridgmon violated Madden's clearly established constitutional rights and are not entitled to qualified immunity in their individual capacities. "Qualified immunity shields public officials from section 1983 liability 'unless their actions' violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Axson-Flynn*, 356 F.3d at 1299. When a defendant makes a qualified immunity claim, the plaintiff has the burden to make a twofold showing: "First, the plaintiff must show that the defendant's alleged conduct violated the law. Second, the plaintiff must show that the law was clearly established when the alleged violation occurred." *Id.* (citation omitted).

Important to this subsection is the fact that neither Keller nor Bridgmon assert qualified immunity for their violations of Madden's First Amendment rights. They only assert qualified immunity as to the Due Process and Equal Protection claims. As such, any assertion of qualified immunity to the First Amendment claims is foreclosed and waived.[12]

### 1. Keller's and Bridgmon's conduct violated Plaintiff's Fourteenth Amendment rights which are clearly established.

"In order to satisfy his or her burden to show that the law was clearly established, the plaintiff need not produce a factually identical case." *Axson-Flynn*, 356 F.3d at 1299.

---

[12] Defendants have not alleged nor can they establish qualified immunity with respect to Madden's First Amendment claims. However, First Amendment rights are clearly established. Madden's Complaint plainly alleges violation of his Frist Amendment rights. Termination for speaking out against nepotism is a "clearly established" violation. *See Banks v. Wolfe Cnty. Bd. of Educ.*, 330 F.3d 888, 897 (6th Cir. 2003). (Defendants' favoritism/nepotism may also have deprived community members of the opportunity to participate in an impartial interview. The community has an interest in knowing how the district's teachers are hired and when the district does not follow state law or its own hiring practices. The plaintiff's allegations could affect the community and therefore touch upon matters of public concern.).

The analysis must take place "in light of the specific context of the case, not as a broad general proposition." *Id.* As the Tenth Circuit has explained, this analysis "is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful, but it is to say that in the light of pre-existing law, the unlawfulness must be apparent." *Lee v. Nicholl*, 1999 10CIR 1479, 197 F.3d 1291, 1296 (affirming denial of qualified immunity on First Amendment free speech claim alleging a danger to public health or safety). Indeed, "officials can still be on notice that their conduct violates established law even in novel factual circumstances." *Hope v. Pelzer*, 536 U.S. 730, 741 (2002).

At this stage in the litigation, Madden is required to plead his claims. Madden "is not required to set forth a prima facie case for each element" of his claims. *Khalik*, 671 F.3d at 1193. Rather, he must only set forth plausible claims "animating the elements of his causes of action." *Burnett*, 706 F.3d at 1236. Defendants flippantly state at page 12 of Defendants' Motion to Dismiss that Madden's claims to be entitled to a process under which evaluations are not changed haphazardly, with sound and verifiable reasoning in decisions, neutral and detached decision makers, as well as transparency in the decision making process all "sound nice," but are not supported in the law. However, "[a] fundamental requirement of due process is a fair[ness] and impartiality." *Clark v. Bd. of Educ. of I.S.D. No. 89*, 2001 OK 56, 32 P.3d 851, 854. The term "fair" is simply a synonym for "disinterested" or "impartial," "principled," "equitable," "legitimate," "reasonable," "unbiased," as well and any other number of adjectives indicating "due process," and "equal protection." It appears that Defendants would have Madden's clearly established rights eviscerated based on semantics. However, the bottom line is that with

respect to his due process rights, Madden was not merely denied his expected continued employment, but the biased and malicious decision makers changed the rules in the middle of the game. If Madden met scholarship criteria on February 11, 2013, they at least owed him a valid explanation or discussion of how sixteen days later he no longer met this requirement.

### a) Keller's and Bridgmon's actions were a violation of Madden's clearly established right to due process.

The process which is <u>due</u> varies under any given circumstance. At the very least it includes a meaningful opportunity to be heard. *Boddie v. Conn.*, 401 U.S. 371, 379 (1971). "The requirements of procedural due process apply only to the deprivation of interests encompassed by the Fourteenth Amendment's protection of liberty and property. When protected interests are implicated, the right to some kind of prior hearing is paramount." *Roth*, 408 U.S. at 569-70.[13]  It is undeniable after *Roth* (recognizing that continued employment is indeed a significant claim), *id.* at 571, and *Connell*, 403 U.S. at 208 (recognizing that a clearly implied promise of continued employment is a property interest) that due process in the employment context is a clearly established right under certain circumstances. Additionally, it is clear under Madden's claims that he was afforded no opportunity to be heard or to respond to Bridgmon's clearly pretextual reasons for his termination. Under Madden's allegations, which at this stage should be taken as true, Keller and Bridgmon apparently changed the criteria for retention after already giving Madden notice that he was being retained. How Madden suddenly failed to meet scholarship and collegiality requirements was never discussed, nor was Madden given the opportunity to be heard regarding the same. The right to due/fair process before

---

[13] Whether Madden had a legitimate expectation to continued employment is addressed *supra* in section III.

deprivation of a legitimate expectation to continued employment is a clearly established right which, as stated in Madden's well plead Complaint, was not provided. Neither Keller nor Bridgmon has an entitlement to qualified immunity in either their official or individual capacities, and their Motion to Dismiss seeking the same should be denied.

> **b)** **Keller's and Bridgmon's actions were a violation of Madden's clearly established right to equal protection.**

Madden seeks equal protection in the manner in which he is reviewed and retained or terminated. Madden is entitled to the same treatment by Keller and Bridgmon as given to other members of the faculty who engaged in similar behavior. Here, Madden engaged in criticism of the Defendants' possible violations of the anti-nepotism policy. Madden claims that as a result, he was singled out, and maliciously targeted for termination. It is undeniable that equal protection in the employment context is a clearly recognized right. This is exemplified in the too numerous to mention cases addressing unlawful or discriminatory practices against individuals because of their sex, race, or religion, to name a few. Title VII protects individuals from this type of discrimination in the private sector, and in the public sector individuals have an added layer of protection with § 1983 and equal protection actions. Here, however, we have recognized that Madden's claim is a "class-of-one" type claim and that he does not belong to a protected class but rather was singled out and maliciously targeted. This fact does not make Madden any less entitled to equal protection under the law. Indeed, it would be surprising to learn that prior to *Village of Willowbrook*, there existed another fact pattern or case in which a homeowner was denied her rights to well water when she refused to give a city a greater easement than the city demanded of other citizens.

The absence of a case identical to Madden's is not sufficient to warrant dismissal of his claims at this early stage. "In order to satisfy his or her burden to show that the law

was clearly established, the plaintiff need not produce a factually identical case." *Axson-Flynn*, 356 F.3d at 1299. Rather, the unlawfulness must be apparent. *Lee*, 197 F.3d at 1296. Defendants cannot reasonably state they were not aware that maliciously singling out Madden, changing his evaluation with no established criteria, and acting arbitrarily and capriciously with respect to his already agreed to retention were violations of Madden's right to be treated fairly. Possibly under another scenario, and if his employer were in the private sector, it could be argued that there is no recourse for such poor actions on the part of the decision maker. However, as the Defendants are government officials, they are not free to deprive Madden of these clearly established rights.

## CONCLUSION

Because RUSO is more like a political subdivision than an arm of the State, RUSO should be held to have no Eleventh Amendment immunity. Defendants NSU, Keller, and Bridgmon are subject to the complete control of RUSO and without RUSO's immunity have no independent Eleventh Amendment immunity themselves. There was a mutual understanding of continued employment which was illegally taken from Madden without due process when Bridgmon targeted him and maliciously fired him. Madden was denied equal protection when Bridgmon and Keller revoked his retention intentionally and maliciously in retaliation for Madden's exercise of his First Amendment rights. As these were all violations of clearly established rights, none of the Defendants have qualified immunity. Based on the foregoing, Defendants should be held to have no Eleventh Amendment immunity and to be lacking qualified immunity. Madden has successfully plead claims for violations of his First Amendment rights as well as his Fourteenth Amendment due process and equal protection rights and as a result Defendants' Motion to Dismiss should be denied in its entirety.

Respectfully submitted,

THE LAW OFFICE OF MCLAINE DEWITT HERNDON,
P.L.L.C.

s/  McLaine DeWitt Herndon
McLaine DeWitt Herndon, OBA No. 20674
320 South Boston Avenue, Suite 1026
Tulsa, OK  74103
(918) 595-3337 – *Telephone*
(918) 289-2612– *Facsimile*
mclaine@mdhok.com
*Attorney for Petitioner*

## CERTIFICATE OF SERVICE

I hereby certify that on June 10, 2013, I electronically transmitted the attached document to the Clerk of Court using the ECF System for filing. Based on the records currently on file, the Clerk of Court will transmit a Notice of Electronic Filing to the following ECF registrants:

M. Daniel Weitman, OBA #17412
Assistant Attorney General
Oklahoma Attorney General's Office
Litigation Division
313 N.E. 21st Street
Oklahoma City, OK  73105
Dan.Weitman@oag.ok.gov

s/ McLaine DeWitt Herndon