## IN THE UNITED STATES DISTRICT COURT FOR THE
## WESTERN DISTRICT OF OKLAHOMA

DAVID P. MADDEN, )
)
    Plaintiff, )
)
v. )     Case No. CIV-13-393-HE
)
REGIONAL UNIVERSITY SYSTEM )
OF OKLAHOMA, a State of Oklahoma )
constitutionally created governing board; )
NORTHEASTERN STATE )
UNIVERSITY, a public university; CARI )
KELLER, an individual (in her individual )
and official capacity); PHILLIP )
BRIDGMON, an individual (in his )
individual and official capacity), )
)
    Defendants. )

## AMENDED COMPLAINT

COMES NOW the Plaintiff, David P. Madden ("Plaintiff" or "Plaintiff Madden"),

by and through his attorney, McLaine DeWitt Herndon, and for his Amended Complaint

against Defendants, states as follows:

### PRELIMINARY STATEMENT

Plaintiff recognizes that this Court's Order (Dkt. # 16) dismisses certain of

Plaintiff's claims; however, despite that some of Plaintiff's claims were dismissed and

are not re-alleged here, to the extent any factual assertions in the original Complaint may

be applicable to any of Plaintiff's remaining claims or the claims re-alleged in his

Amended Petition, all facts are realleged.

## JURISDICTION AND VENUE

1.      This action arises and is brought pursuant to 42 U.S.C. § 1983 to remedy the deprivation, under color of state law, of rights guaranteed to all of its citizens, including Plaintiff, by the United States Constitution, specifically, the First Amendment and the Due Process and Equal Protection Clauses of the Fourteenth Amendment. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331.

2.      Venue in this Court is proper under 28 U.S. C. § 1391(b)(1) as the Defendant Regional University System of Oklahoma (hereinafter "RUSO") is located in this district and all other Defendants are located in this state.

## JURY DEMAND

3.      Plaintiff hereby respectfully demands a jury trial pursuant to 42 U.S.C. § 1983(a).

## THE PARTIES

4.      Plaintiff Madden is, and was at all times mentioned herein, an adult citizen of the United States and a resident of the State of Oklahoma, Cherokee County.  He was an Assistant Professor of criminal justice at Northeastern State University (hereinafter "University" or "NSU").

5.      Defendant NSU is a state actor and a public university located in Tahlequah, Oklahoma and was Plaintiff Madden's employer.

6.      Defendant RUSO is a state of Oklahoma constitutionally created governing board and is responsible for governance of NSU, Plaintiff Madden's former employer.

7.    Defendant Phillip Bridgmon (hereinafter "Dean Bridgmon" or "Bridgmon") is sued both in his individual and official capacities, as a state actor and employer.  He is, and was at all times mentioned herein, an adult citizen of the United States and the Dean of the College of Liberal Arts at NSU, a public university supported by the federal and state tax dollars of Oklahomans.  On February 27, 2013, in a reversal of Defendant Cari Keller's (hereinafter "Keller") decision to retain Plaintiff Madden, Dean Bridgmon terminated Madden's contract with NSU.

8.    Defendant Keller is a professor of criminal justice at NSU and at the time of Madden's termination was the Chair of the Department of Criminal Justice and Legal Studies at NSU.  She is sued both in her individual and official capacities, as a state actor. She is, and was at all times mentioned herein, an adult citizen of the United States and the Chair of the Department of Criminal Justice and Legal Studies at NSU and, in reality and in practice, held the ultimate authority as a decision maker with respect to retention of Plaintiff Madden.  She was a key player in Plaintiff Madden's firing.

## STATEMENT OF FACTS

9.    Plaintiff Madden graduated from the University of Tulsa, College of Law in 1979 and worked for over 30 years in Tulsa, Oklahoma; Overland Park, Kansas; Kansas City, Missouri and Texas in the capacity of associate, partner, managing partner and "of counsel" as a trial lawyer.  He is a Certified Civil Trial Lawyer by the National Board of Trial Advocacy and was elected to the American Board of Trial advocacy by his peers. He is also rated as AV by Martindale-Hubbell.

10.     In 2007, he moved to Tahlequah where he worked for Legal Aid as a staff attorney, assisting the indigent and disenfranchised in need of legal assistance in Northeastern Oklahoma.

11.     In 2008, he applied for a position as an adjunct professor with NSU.  He was hired to teach as an adjunct professor in the Criminal Justice and Legal Studies Program, (hereinafter the "Legal Studies Program") at NSU's Broken Arrow campus.

12.     In 2009, he was hired as a full time tenure track Assistant Professor and began teaching in the Legal Studies Program at NSU's Broken Arrow and later Tahlequah campus.

**Plaintiff Madden's Criticism of the University:**

13.     While working as an Assistant Professor in the Legal Studies Program, Plaintiff Madden advocated for greater scholarship requirements for professors in the Legal Studies Program, for enhanced writing programs for the students and more academic training for the Program's students, and was critical in general of NSU's failure to implement programs to better scholarship as well as student success at NSU.  Plaintiff Madden was asked to investigate and make a determination as to whether the NSU Legal Studies Program should seek accreditation for its paralegal studies program.  Professor Madden made a recommendation in 2010 that the University seek accreditation of its paralegal program by the American Bar Association.  This accreditation would have resulted in many benefits to the students enrolled in the program.  In order to obtain accreditation, Mr. Madden argued that the school's library resources should be upgraded.

14.    Specifically, Plaintiff Madden was critical of NSU and the Criminal Justice Program's failure to properly fund, staff and implement the Collegiate Officer Program (hereinafter "COP").  COP is designed to enable students to obtain certification from the state of Oklahoma as peace officers as a result of completing a training program while enrolled in a baccalaureate program at a four year university.  In 2009, Plaintiff Madden was asked to and agreed to take over as director of COP.

15.    Before Plaintiff Madden took over the program, it had been in existence at NSU for approximately twenty (20) years and yet no one had ever graduated from the program.

16.    COP has specific requirements, some of which were being met under the prior director's control.  The COP director immediately prior to Plaintiff Madden was Steve Dunker (hereinafter "Mr. Dunker").   While Plaintiff Madden was assigned to teaching duties in Broken Arrow, faculty members discussed in his presence how Mr. Dunker had obtained tenure. These faculty members asserted that no one had voted in favor of Mr. Dunker obtaining tenure, and one faculty member asserted that all of the tenured faculty members on the committee had abstained from voting for Mr. Dunker's tenure.  It was asserted by one faculty member that the only scholarship that Mr. Dunker had engaged in was preparing a test based upon text book instructions. Despite objections, Mr. Dunker obtained tenure.  This was the last faculty member to obtain tenure before Plaintiff Madden was hired.  CLEET requires the professors teaching the law courses for the COP program to be lawyers admitted to the practice of law in the state of Oklahoma.  Mr. Dunker had taught these courses in the program for years and

was not admitted to the practice of law in Oklahoma. Mr. Dunker had also claimed to be a certified Oklahoma Police Officer, which he was not. No one in the department had discovered these omissions until Plaintiff Madden was asked to take over the COP program.

17. The Collegiate Officer Program at NSU had no funding and only through the energy and contacts of one of the faculty members in Broken Arrow was the program able to put together practical skill courses to complete all the requirements for COP students. In the two years that he was director of the program, Plaintiff Madden expended considerable personal time and financial support to the students enrolled in the program, including driving students back and forth from Tahlequah to Broken Arrow on a daily basis so the students would not have to spend personal funds for transportation costs. He purchased targets for firearms training out of his own funds and then made sure that he was on-site on a daily basis for training to monitor instruction and ensure that CLEET requirements were being met. Exhibit 1 is a letter from the director of the Collegiate Officer Program to Dean Paul Westbrook, commending Plaintiff Madden for his efforts with regard to the program.

18. Plaintiff Madden was highly critical of NSU for allowing the credentialing lapse enumerated in paragraph 16 above and continued to voice his concerns regarding the level of scholarship and teaching as it currently existed at NSU. Plaintiff Madden was publically critical of NSU's failure to adhere to standard scholarship requirements as well as its failure to follow policy and procedure of both the programs offered to students

as well as the academic and internal policies that applied to professors and other academicians.

19.    Plaintiff Madden was critical of the employment of adjuncts who did not adequately academically engage the students who were charged to their care.  In the fall of 2012, Phyllis Wilmon, secretary of the Dean of the College of Liberal Arts, had a conversation with Plaintiff Madden in which she indicated she had been a dinner guest at the home of some friends.  These friends related to Ms. Wilmon that their son's life had been changed by a professor at NSU, and that professor was Plaintiff Madden.  Ms. Wilmon stated to Plaintiff Madden that the problem in the Criminal Justice Department was adjuncts.

20.    Despite these criticisms, throughout his employment at NSU Plaintiff Madden received high ratings from student evaluations, which are well documented, as well as exemplary reviews from colleagues and in annual reviews.  He received these positive ratings despite the fact that Plaintiff Madden was at times critical of NSU and made it a goal as an academician to improve the University by insisting on the importance of implementing various academic-related benchmarks and standards for faculty and students.

21.    Plaintiff Madden's criticisms of NSU were made as an academic speaking on matters of public concern at a public university.

**Plaintiff Madden's 2012 Criticism of Potential Violation of University Anti-Nepotism Policy:**

22.     In March of 2012, a colleague from another department, Dr. Brad Agnew (hereinafter "Dr. Agnew"), approached Plaintiff Madden and asked him what he thought about what Dr. Agnew saw as a potential violation of the University's anti-nepotism policy.  *See* Exhibit 2 (email from Brad Agnew).

23.     Dr. Agnew was a faculty member of the History department.  He has taught at NSU for 50 years and is known as the historian of NSU.

24.     Specifically, Dr. Agnew told Plaintiff Madden that the Political Science hiring committee was being pressured to hire the wife of the incoming Dean, Dean Bridgmon, for a position in the Political Science Department.

25.     Dr. Agnew knew that Plaintiff Madden had been a practicing attorney for thirty (30) years and was interested in Plaintiff Madden's interpretation of the University handbook with respect to this issue.

26.     Upon reviewing the University handbook, Plaintiff Madden agreed with Dr. Agnew that hiring Dean Bridgmon's wife in this position would in fact be a violation of the University's anti-nepotism policy.  Dean Bridgmon's wife was eventually hired.

27.     Plaintiff Madden openly discussed this issue with Dr. Agnew both at the University and in private.

28.     Dr. Agnew did not ask for Plaintiff Madden's interpretation of NSU's policy on this point as an official matter, but rather as two individuals discussing their interpretation of NSU's actions.

29.     Plaintiff Madden discussed this anti-nepotism issue with several individuals, including with another colleague in Dr. Agnew's department, Mark Carper (hereinafter "Dr. Carper"), stating again that he believed hiring of the new Dean's wife to be a violation of the University's anti-nepotism policy.

30.     In reality, this anti-nepotism issue at NSU did not have any bearing on Plaintiff Madden, his official duties or his teaching and it would have no direct impact on and was truly no concern for Plaintiff Madden in his function in his own department at the University. This opinion was not given within the course and scope of any assigned duties at NSU.

31.     Plaintiff Madden merely engaged in free and open criticism of the University, identifying yet another instance of the University's failure to follow standards and protocols – this time in another faculty member's department.

32.     Approximately two weeks after his discussion with Dr. Agnew, the chair of the Social Sciences department, William Corbett (hereinafter "Dr. Corbett"), came to Dr. Carper's office, located adjacent to Plaintiff Madden's office, and announced in a very loud voice that "it is not true that the committee is being pressured to hire the Dean's wife".

33.     After Dr. Corbett confronted Dr. Carper about these criticisms, Plaintiff Madden followed Dr. Corbett to his office and informed him that it was Dr. Corbett's colleague, Dr. Agnew, who was the source of the information concerning the committee being pressured.

34.    Other members of NSU heard about Plaintiff Madden's discussions concerning possible nepotism violations and recalled that problems regarding nepotism had occurred previously with professors in the Department of Languages and Literature who were husband and wife.

35.    Dean Bridgmon, the new Dean of the College of Liberal Arts, did not start his service at the University until July 2012, more than four (4) months following Plaintiff Madden's discussions about whether the Political Science Department's hiring committee was being pressured to hire his wife and whether this action was a violation of the anti-nepotism policy.

**NSU's Non-Tenured Faculty Review Process**

36.    NSU has a specific review process for non-tenured professors set forth at Section 3.44 of its Faculty Handbook.

37.    In the section governing the "Annual Evaluation" of non-tenured professors, evaluators are cautioned that recommendations for retention shall be based on a demonstration of progress toward tenure commensurate with departmental expectations. *See* Exhibit 3, § 3.442.  Keller was the Chair of the Department of Criminal Justice and Legal Studies and it was her expectations that had to be met for retention.  Had Plaintiff Madden not met the department's expectations, Keller would not have circled "retention" on his 2013 review.  Keller has since been promoted to Assistant Dean to the College of Liberal Arts which is a new position that in NSU's history has not existed until Keller assumed the position.

38.     *Inter alia* the policy manual states, "[t]o be recommended for retention, candidates shall demonstrate evidence of making progress towards tenure commensurate with departmental expectations.  It is essential that retention decisions be made with due recognition that they lead toward a tenure decision. Accordingly, **a recommendation for retention shall be made only when the candidate has responded appropriately to previous retention reviews and is clearly on track towards tenure**.  By February 1st of the spring semester of each year of the probationary period, the retention/mentoring committee must forward its retention recommendation to the appropriate administrators." *Id.* (emphasis added).

39.     The Faculty Handbook clearly outlines the expectations and significance of a faculty member slated for retention.

40.     For review of non-tenured professors under both NSU's policies and in the manner in which they conduct their review practices in fact, a decision to retain is (1) within the department's purview and (2) operates to extend a faculty members contract. It is notable that beyond annual reviews during which an individual is recommended for retention or not, there is no other step in the retention process.  In other words, there is no additional signing of a renewed contract and the determination of criteria for retention is clearly placed with the departments themselves, in this case with Keller.

41.     In fact, concerning retention, it was not unusual for an individual being reviewed to hear nothing back from any other individual or receive any other feedback other than that received by his or her department chair.

42.    It is common knowledge among faculty and department heads, including former department heads, that while NSU may have written policies setting forth procedure for evaluations and reviews, the practice is in fact very different if it is adhered to at all.

43.    Part of the review of non-tenured professors includes the "RTP" retention/tenure/promotion process.  This is a process whereby faculty are required to compile their professional portfolio to demonstrate how they are working toward tenure and promotion.  This process is not "retention" itself, but rather is the process by which individuals demonstrate and are judged on their progress toward promotion and tenure.

44.    Further, under NSU's policy, non-reappointment is delegated to University presidents, "or his or her designees."  *See* Exhibit 4, § 3.443.

45.    Notification of non-reappointment is to occur prior to March 1 of the year in which the employee is being evaluated.  *Id*.

**Non-Tenured Faculty Review in the Legal Studies Program.**

46.    Keller was the head of the Legal Studies Program and was responsible for evaluating non-tenured professors within that Department, including Plaintiff Madden.

**Spring 2010 Evaluation of Plaintiff Madden's 2009-2010 Academic Year:**

47.    Plaintiff Madden's 2010 spring evaluation took place on May 17, 2010, well after the March 1 deadline for such evaluations.

48.    He was evaluated on a form called a "Faculty Evaluation Report," hereinafter ("Report").    This Report contains Plaintiff Madden's goals and is

accompanied by a "Summary and Evaluation of the Achievements of Dr. David P. Madden, Fall 2009-Spring 2010 Academic Year," (hereinafter "Summary Evaluation").

49.     This evaluation form is different than the evaluation form used in subsequent years.

50.     The Report contains two undifferentiated signature blocks for generic and un-named "administrators" and is accompanied by the Summary Evaluation. The Summary Evaluation is written by Keller and sets forth the details of Plaintiff Madden's performance and expresses vague expectations with respect to continued employment with NSU.

51.     The Report was signed by Madden and Keller on May 17, 2010 and initialed by the then Dean of the College of Liberal Arts, Dean Paul Westbrook (hereinafter "Westbrook") on "7-2011."

52.     The Summary Evaluation is signed on May 17, 2010 by Keller and on June 10, 2010 by Westbrook.

53.     The 2009-2010 evaluation was favorable although the word "retention" is never used; the evaluation sets forth Madden's own "goals" for the next performance review and states that he will begin committee service assignments in the 2010-2011 academic year.

54.     However, had the evaluation been unfavorable, NSU was required to notify Plaintiff Madden of non-retention by March 1 of the review year.  The 2010 review did not happen until well after this date.  This is likely because the ultimate decision with

respect to whether to retain Madden was with Keller who had already made up her mind to retain him.

55.     The Report and Summary Evaluation was merely the paperwork submitted to back the decision to continue Plaintiff Madden's employment through the next year.

**Spring 2011 Evaluation of Plaintiff Madden's 2010-2011 Academic Year:**

56.     In 2011, the NSU Faculty Handbook was revised to specifically implement the Boyer model of scholarship.  This is an academic model advocating expansion of the traditional definition of scholarship and research into four types of scholarship.  To be considered "scholarship" professors' university activities are expected to fulfill the tenants of the Boyer model.  The Boyer model was utilized by NSU in the past but not until 2011 was it specifically and more extensively integrated into the Faculty Handbook.

57.     Plaintiff Madden's 2011 spring evaluation took place on June 6, 2011, well after the March 1 deadline for such evaluations.

58.     This evaluation form is different than the previous evaluation form and different from the form used in 2012-2013.  This evaluation form contains two parts.  The first part contains sections to outline goals for the coming year, as well as a review and performance appraisal of the faulty member for the previous year.  The second part is a "Letter of Evaluation."

59.     This first part, although not completed was signed by Keller and Madden on June 9, 2011 and by Westbook on July 8, 2011.  The second part, the "Letter of Evaluation", sets forth the details of Plaintiff Madden's performance as well as the

expectations with respect to continued employment with NSU. It is signed by both Keller and Plaintiff Madden on June 9, 2011 and initialed by Westbrook, date missing.

60. The first part of the Letter of Evaluation states that it is "evidence that Mr. Madden has met the professional requirements of Appendix C and the Boyer model."

61. This Letter of Evaluation is favorable although the word "retention" is never used; the Letter of Evaluation notes that Plaintiff Madden "exceeded expectations," and "is an asset to his colleagues and students."

62. However, had the evaluation been unfavorable, NSU was required to notify Plaintiff Madden of non-retention by March 1 of the review year. The 2011 review did not happen until well after this date. This is likely because the ultimate decision with respect to whether to retain Madden was with Keller who had already made up her mind to retain him.

63. The "Letter of Evaluation" was merely the paperwork submitted to back the decision to continue Plaintiff Madden's employment through the next year.

**Spring 2012 Evaluation of Plaintiff Madden's 2011-2012 Academic Year:**

64. Plaintiff Madden's 2012 spring evaluation took place on June 28, 2012, well after the March 1 deadline for such evaluations.

65. For the 2011-2012 academic year evaluation Plaintiff Madden was only provided with a "Letter of Evaluation" written and signed by Keller. There was no accompanying form and no other signature or approval by any other administrator. The evaluation was presented to Plaintiff Madden on June 28, 2012.

66.    This evaluation is favorable although the word "retention" is never used. The evaluation notes that Plaintiff Madden "continues to meet expectations," and that "NSU students are fortunate to have him."

67.    However, had the review been unfavorable, NSU was required to notify Plaintiff Madden of non-retention by March 1 of the review year.  The 2012 review did not happen until well after this date.  This is likely because the ultimate decision with respect to whether to retain Madden was with Keller who had already made up her mind to retain him.

68.    The "Letter of Evaluation" was merely the paperwork submitted to back the decision to continue Plaintiff Madden's employment through the next year.  Further, for 2011-2012 his evaluation was not accompanied by the form containing the signature of any other administrator and the "Letter of Evaluation" was not signed by any other administrator.  It is clear that for 2011-2012 Plaintiff Madden's expectation of continued employment rose and fell with Keller's decision.

### Spring 2013 Evaluation of Plaintiff Madden's 2012-2013 Academic Year:

69.    On February 11, 2013, Plaintiff Madden was formally reviewed by Keller.

70.    The 2012-2013 evaluation form was new and had not been utilized in the past.

71.    The new evaluation form is labeled "Department of Criminal Justice & Legal Studies Boyer Rubric" and has a place for Keller and for Plaintiff Madden to sign.

72.    This form has an area for the reviewer, here Keller, to circle "Retention," "Tenure," or "Promotion."  She circled "Retention."  This was not a recommendation;

this was a decision.  The form does not state "recommend" or "suggest" one of the three choices but directs the individual to "Circle" one of the three choices.

73.     The only "recommendation" on this form was as to "RTP."  The Third page of the form states "RECOMMENDATION REGARDING RTP."  In that section Keller wrote "Retain for the AY 2013-2014 and look favorably on his progress toward tenure."

74.     According to the Faculty Handbook, "RTP" refers to "retention/tenure/promotion."  "RTP" is both a "process" and a "file."  The Faculty Handbook states that "[o]bjective evaluation of the quality and significance of scholarly achievement in each scholarly area is the cornerstone of NSU's RTP process. Professional Portfolios make up the candidate-developed portion of the retention, tenure, and promotion (RTP) file.  Faculty members scheduled for evaluation shall prepare a portfolio as described below." *See* Exhibit 5, Excerpt from Appendix C1 of the Faculty Handbook (emphasis added).  In other words Keller's recommendation as to the RTP process was that Plaintiff Madden was making favorable progress in that process.  Her decision was for retention.

75.     This new form allowed Keller to make a decision as to retention for the upcoming year, plus a recommendation with respect to Madden's progress toward tenure.

76.     The "RTP" recommendation appears only to come into play when a faculty member is requesting or eligible for a "change in rank."  In the event a faculty member is requesting or eligible for a change in rank, the results of all "RTP" recommendations are "added to an RTP file and forwarded to the next level of review, with a copy of the recommendation to the candidate."  *See* Exhibit 6, § 3.362 Procedure.

77.     Plaintiff Madden was neither eligible for nor seeking a "change in rank."

78.     Keller was the decision maker with respect to Madden's continued employment and her 2012-2013 evaluation of Madden created a bilateral expectation of continued employment between Madden and NSU.

79.     Madden received on target "meets criteria" marks for both scholarship and collegiality and "above criteria" for teaching and University service.  After deciding that Madden met the Boyer criteria, Keller decided that Plaintiff Madden should be retained and she recommended him favorably for the tenure process.  This evaluation was consistent with three previous evaluations done by Keller as part of the tenure and retention review process.  *See* Exhibits 7, 8, 9 and 10 (annual evaluations).

**The Campaign to Reverse the Decision to Retain Madden.**

80.     From February 14th until the 17th 2013, Plaintiff Madden was on a school sponsored trip to Dallas as coach for the University's Mock Trial Team.  When he returned, on approximately February 17, 2013, he received an email from Keller indicating that a non-departmental colleague had complained about his conduct and other negative matters.

81.     Further, directly upon his return, Plaintiff Madden was told by another colleague, Adam Langsam, that while Madden was on the school trip, Keller appeared to have been interviewing various faculty members concerning Plaintiff Madden.

82.     Following the February 17th email from Keller, Plaintiff Madden had a discussion with her wherein she revealed that she had conversations with both Dr.

Corbett and Dean Bridgmon concerning Plaintiff Madden's criticism of the University in relation to the anti-nepotism policy.

83.     During this conversation, Keller informed Plaintiff Madden that it was "not his job to interpret University policy."

84.     Keller admits to asking for a conference in February 2013 with Dr. Corbett to discuss Plaintiff Madden's conversation about nepotism with him.

85.     This admonishment took place after Keller's evaluation of Plaintiff Madden in which he was marked for retention and after her conversation with Dean Bridgmon where he had raised the issue of Plaintiff Madden's concerns regarding the hiring of Dean Bridgmon's wife.

86.     After this meeting, Plaintiff Madden had very little contact with Keller.

87.     On February 27, 2013, Dean Bridgmon summoned Plaintiff Madden to his office and gave him notice that he would not be retained.  Dean Bridgmon had never talked to Plaintiff Madden prior to February 27th about any issue.  There was no prior criticism. There was no counseling. There was no evaluation.

88.     It is unclear how the March 2012 criticisms and discussions were relayed to Dean Bridgmon; however, in a conversation with Keller, Dean Bridgmon claimed knowledge of the incident from an unidentified informer.

**NSU's Purported Reasons for Non-Retention of Plaintiff Madden:**

89.     As grounds for its decision not to retain Plaintiff Madden, the University cited his (1) failure to meet scholarship requirements and (2) non-collegiality. However, neither of these grounds is supported by the documented history of Plaintiff Madden's employment.

90.     As to scholarship, the claim by the University that Plaintiff Madden did not meet this requirement is unfounded given the fact that Plaintiff Madden is the professor who pushed hardest for and championed the necessity and importance of peer-reviewed scholarship among the faculty in the Legal Studies Program and employment of Ph.D.'s in order to bring NSU's program more into line with national programs in criminal justice.

91.     There was no requirement to publish articles in peer reviewed journals until Plaintiff Madden argued that all of the faculty should be required to publish at least one article in a peer-reviewed journal prior to their consideration for tenure. Other faculty members also supported the idea that the Legal Studies Program did not have an acceptable scholarship requirement.

92.     Additionally, a review of those professors who are either still up for tenure, i.e., being retained, or who recently received tenure would reveal that their scholarship is on level or below that of Plaintiff Madden.

93.     Moreover, this reason for non-retention is untenable given Plaintiff Madden's February 11, 2013 review by Keller stating that Plaintiff Madden *currently meets* the scholarship criteria.

94.    It is unclear how Plaintiff Madden could be found to meet scholarship on February 11, 2013 and 16 days later his lack of scholarship could be grounds for his non-retention.  His scholarship would have been the same at both instances and was on target or above other professors in the same department who were retained.  Dean Bridgmon's reasoning is clearly pretextual and inconsistent with written evaluations of Plaintiff Madden's work.

95.    Regarding the claim of Plaintiff Madden's non-collegiality, Plaintiff Madden's personnel file, his past as well as 2013 reviews by the Chair, and the number of recommendation letters he has received from other professors since the University's decision not to retain him are indicative that this claimed reason for non-retention is pretext.

96.    Plaintiff Madden was told by Dean Bridgmon when he received his non-retention letter that a poll of the faculty in the Legal Studies Department indicated they would not vote for him for tenure.  This assertion is clearly not fact-based.  There were only five tenured professors in the Criminal Justice Department when Dean Bridgmon made this statement.  However, upon information and belief, it is clear that no poll was taken of all the tenured faculty members.  Specifically, Charles Dreveskracht, a tenured profession in the criminal justice department, said that he had never been consulted about Plaintiff Madden's retention or chances for tenure.  Mr. Dreveskracht, instead, appeared surprised that Plaintiff Madden had not been retained.

97.    Plaintiff Madden's file and the history of his interactions with various faculty members demonstrate none of Plaintiff Madden's actions went beyond zealous

representation of his ideas for growth and a commitment to maintaining the highest quality of scholarship for all faculty and students.

98.     While Plaintiff Madden was known to be constructively critical of the University and the Legal Studies Program's commitment to academic growth, the criticism of the University regarding the employment of the Dean's wife and the University's violation of the anti-nepotism policy was more than the University would tolerate.

## CLAIMS FOR RELIEF

### COUNT I:
### VIOLATION OF THE FIRST AMENDMENT

99.     Plaintiff hereby incorporates paragraph 1 through 98.

100.    The First Amendment of the United States Constitution guarantees individuals the right to associate and express themselves on matters of public concern without fear of reprisal from their government.

101.    This guarantee prohibits the government, when acting as employer, from firing, refusing to promote and / or refusing to hire citizens because of their private views and opinions on matters of public concern.

102.    NSU, a public university funded by state and federal tax dollars, has violated Plaintiff Madden's First Amendment rights by allowing Dean Bridgmon, under color of law, to target and discriminate against Plaintiff Madden for his criticism of University-sanctioned actions and potential violations of its anti-nepotism policy.

103. NSU, a public university funded by state and federal tax dollars, has violated Plaintiff Madden's First Amendment rights by allowing Keller, under color of law, to target and discriminate against Plaintiff Madden for his criticism of University-sanctioned actions and potential violations of its anti-nepotism policy.

104. RUSO, a public board funded by state tax dollars, has violated Plaintiff Madden's First Amendment rights by failing to ensure Plaintiff Madden was not targeted and retaliated against for his exercise of his First Amendment rights. RUSO is responsible for governance of Oklahoma's Regional University System, including NSU.

105. RUSO is responsible for (1) reviewing the general academic policy and its administration within the six regional universities, including NSU; (2) being informed of relevant academic issues and their potential impact on the institutions; and (3) cooperating with institutional Presidents and Chief Academic Officers in planning strategy to address issues at the institutional and governing Board level of the State System.

106. In this case, Dean Bridgmon, individually and acting on behalf of the governmental employer, NSU, has violated Plaintiff Madden's First Amendment rights by retaliating against him because he exercised his First Amendment Rights in criticizing the University for its violation of the anti-nepotism policy.

107. Keller, individually and acting on behalf of the governmental employer, NSU, has violated Plaintiff Madden's First Amendment rights by working with Dean Bridgmon to build a superficial and bogus case against Plaintiff Madden in order to

justify the non-retention solely because he exercised his First Amendment Rights in criticizing the University for its violation of the anti-nepotism policy.

108. The University, Dean Bridgmon, RUSO and Keller retaliated against Plaintiff Madden for exercising his right to free speech provided by the First Amendment of the United States Constitution in the following particulars: by contributing to the campaign against Plaintiff Madden for private statements made by him which touched on a matter of public concern. Speech touches on matters of public concern when it is spoken by a public employee and when it deals with matters of political, social or other community concern.

109. Plaintiff Madden's criticism of the University's actions outweighs the University's, Dean Bridgmon's, RUSO's and Keller's interest in regulating Plaintiff Madden's speech.

110. As a direct and proximate cause of the University's, Dean Bridgmon's, RUSO's and Keller's actions, Plaintiff Madden has suffered economic damages in an amount not less than $1,000,000.00.

111. Pursuant to 42 U.S.C. § 1983, Plaintiff Madden is entitled to recover a money judgment for his economic damages, judgment for his attorney's fees and costs incurred and punitive damages. Plaintiff Madden is further entitled to such injunctive and equitable relief as the Court deems just and proper.

## COUNT II:
## VIOLATIONS OF DUE PROCESS & EQUAL PROTECTION

### (i)
### Changing the Decision to Retain

112.    Plaintiff hereby incorporates paragraphs 1 through 111.

113.    The essential guarantee of the Due Process Clause of the United States Constitution is that of fairness: government processes must be fair and impartial.

114.    When the government acts as a prospective employer, due process forbids it from changing the evaluative process and criteria after it has been officially completed. Plaintiff Madden, evaluated among other areas, on his level of scholarship and collegiality, was found to have satisfactorily met or exceeded these criteria one instant and suddenly found to be lacking these credentials sufficient to warrant his non-retention the next.  In its simplest form, the criteria of an acceptable level of "scholarship" in university professors can be defined as the means by which they remain current in their discipline, improve their knowledge thus making them better teachers, and bring recognition to the institution and themselves.

115.    NSU and the Legal Studies Department did not have set criterion by which to judge scholarship and Plaintiff Madden was critical of this lack of University policy.

116.    In this case, Plaintiff Madden was reviewed and granted retention on February 11, 2013.  In actions that can only be described as unfair and biased, NSU, Dean Bridgmon and Keller, with no new facts related to the criteria being evaluated, sixteen (16) days later decided not to renew his contract.

117. However, between February 11, 2013 and February 27, 2013, Plaintiff Madden's level of scholarship could not have changed. If his scholarship was satisfactory on February 11, 2013, the sudden change in its acceptability based on no new facts is a violation of Plaintiff Madden's Due Process rights.

118. It is the policy and practice of the University indeed to retain those individuals who receive evaluations and recommendations from the chair of their department that they be retained. After receiving the affirmative decision on retention from the chair of his department, Keller, Plaintiff Madden held an explicit mutual understanding with the University that supports his claim of entitlement to the benefit of retention for at least the next year. Each year since 2009 and including 2013 Keller was the decision maker with respect to Madden's continued employment. In 2013, she circled "Retained" making the decision that Madden met the department chair's expectations for retention. Further, she recommended him favorably in the "RTP" process. After that February 2013 evaluation and decision, all parties had a mutual understanding that Madden would continue to work at NSU.

119. Plaintiff Madden was singled out for discriminatory treatment on an irrational and wholly arbitrary basis motivated by Dean Bridgmon's and Keller's spiteful effort to punish and get rid of Plaintiff Madden for reasons wholly unrelated to any legitimate state objective.

120. The acts of NSU, RUSO, Dean Bridgmon and Keller violated Plaintiff Madden's Fourteenth Amendment right to Due Process.

121.    As a direct and proximate cause of the University's, Dean Bridgmon's, RUSO's and Keller's actions, Plaintiff Madden has suffered economic damages in an amount not less than $1,000,000.00.

122.    Pursuant to 42 U.S.C. § 1983, Plaintiff Madden is entitled to recover a money judgment for his economic damages, judgment for his attorney's fees and costs incurred and punitive damages.  Plaintiff Madden is further entitled to such injunctive and equitable relief as the Court deems just and proper.

**(ii)**
**Arbitrary and Capricious Conduct**

123.    Plaintiff hereby incorporates paragraphs 1 through 122.

124.    The Due Process and Equal Protection Clauses also prohibit arbitrary and capricious governmental decision-making in hiring, retaining, or applying one standard for some applicants and another standard for others.

125.    In this case, the University accepted and retained some faculty with scholarship levels equal to or less than Plaintiff Madden's scholarship, unequally applying standards between Plaintiff Madden and other professors.

126.    In this case, Plaintiff Madden met the scholarship criteria for retention and then sixteen (16) days later, his level of scholarship was used as grounds to refuse to retain him.

127.    Other faculty members who were retained, or even promoted and given tenure, had scholarship on level or below that of Plaintiff Madden.

128. In this case, the University applied differing standards as to collegiality when it continued to retain faculty members who had been the target of multiple student complaints and petitions regarding their classroom demeanor and collegiality.

129. The acts of NSU, Dean Bridgmon and Keller are suspect in timing, as a departure from normal procedures and are unexplainable on other grounds.

130. Plaintiff Madden was singled out for discriminatory treatment on an irrational and wholly arbitrary basis motivated by Dean Bridgmon's and Keller's spiteful effort to punish and get rid of Plaintiff Madden for reasons wholly unrelated to any legitimate state objective.

131. The acts of NSU, RUSO, Dean Bridgmon and Keller were intentional violations of Plaintiff Madden's Fourteenth Amendment rights to Equal Protection under the law.

132. As a direct and proximate cause of the University's, Dean Bridgmon's, RUSO's and Keller's actions, Plaintiff Madden has suffered economic damages in an amount not less than $1,000,000.00.

133. Pursuant to 42 U.S.C. § 1983, Plaintiff Madden is entitled to recover a money judgment for his economic damages, judgment for his attorney's fees and costs incurred and punitive damages. Plaintiff Madden is further entitled to such injunctive and equitable relief as the Court deems just and proper.

**(iii)**
**Neutral and Detached Decision Makers**

134. Plaintiff hereby incorporates paragraphs 1 through 133.

135.    To ensure the governmental processes are fair and impartial, government decision makers must be neutral and detached.

136.    Dean Bridgmon was anything but detached when he reversed the decision to retain Plaintiff Madden as a result of Madden's criticism of Dean Bridgmon and the University's violation of the anti-nepotism policy.

137.    Keller was anything but detached when she, despite making the decision to retain Plaintiff Madden, facilitated Dean Bridgmon in mounting a retaliation campaign against Plaintiff Madden.   Since assisting Dean Bridgmon in discharging Plaintiff Madden, Keller has been promoted by Dean Bridgmon.

138.    Plaintiff Madden was singled out for discriminatory treatment on an irrational and wholly arbitrary basis motivated by Dean Bridgmon's and Keller's spiteful effort to punish and get rid of Plaintiff Madden for reasons wholly unrelated to any legitimate state objective.

139.    The acts of NSU, RUSO, Dean Bridgmon and Keller were intentional violations of Plaintiff Madden's Fourteenth Amendment rights to Equal Protection under the law.

140.    As a direct and proximate cause of the University's, Dean Bridgmon's, RUSO's and Keller's actions, Plaintiff Madden has suffered economic damages in an amount not less than $1,000,000.00.

141.    Pursuant to 42 U.S.C. § 1983, Plaintiff Madden is entitled to recover a money judgment for his economic damages, judgment for his attorney's fees and costs

incurred and punitive damages. Plaintiff Madden is further entitled to such injunctive and equitable relief as the Court deems just and proper.

**(iv)**
**Sound Review Procedures**

142. Plaintiff hereby incorporates paragraphs 1 through 141.

143. At the very least, the University owes its faculty transparency and honesty in its review process. Plaintiff Madden can only assume that the University did, in fact, provide both transparency and honesty in its review process on February 11, 2013, thus making this new trumped up claim of failure to meet the scholarship requirements and non-collegiality faulty at best, and very likely a fraudulent attempt to support its illegal actions.

144. If the University, Dean Bridgmon, Keller, or others believed that Plaintiff Madden's scholarship warranted non-retention and that he was sufficiently non-collegiate as to warrant non-retention, they would have done well to document these views contemporaneously.

145. Procedures allowing for a change in evaluation from "meets criteria" to a failure sufficient to warrant non-retention are highly questionable as they allow for the type of targeting that occurred in Plaintiff Madden's case.

146. The process and procedure for review and retention was changed and applied unequally to Plaintiff Madden in an arbitrary and discriminatory manner for his outspoken views and unpopular criticism of the University's acts and policies.

147. Plaintiff Madden was singled out for discriminatory treatment on an irrational and wholly arbitrary basis motivated by Dean Bridgmon's and Keller's spiteful effort to punish and get rid of Plaintiff Madden for reasons wholly unrelated to any legitimate state objective.

148. The acts of NSU, RUSO, Dean Bridgmon and Keller were intentional violations of Plaintiff Madden's Fourteenth Amendment rights to Due Process and Equal Protection under the law.

149. As a direct and proximate cause of the University's, Dean Bridgmon's, RUSO's and Keller's actions, Plaintiff Madden has suffered economic damages in an amount not less than $1,000,000.00.

150. Pursuant to 42 U.S.C. § 1983, Plaintiff Madden is entitled to recover a money judgment for his economic damages, judgment for his attorney's fees and costs incurred and punitive damages. Plaintiff Madden is further entitled to such injunctive and equitable relief as the Court deems just and proper.

## CONCLUSION

A public university with state actors employed for the benefit of the public cannot be permitted to violate rights guaranteed by the First Amendment and the Due Process and Equal Protection Clause of the Fourteenth Amendment. There are no compelling, important, or legitimate state interests that would justify the University's, Dean Bridgmon's, RUSO's and Keller's actions with respect to the violations of Plaintiff Madden's First Amendment rights to free speech and his Fourteenth Amendment rights to due process and equal protection under the law.

Individual Defendants Dean Bridgmon and Keller, individually and in their official capacities and under color of law, acted willfully, wantonly, and maliciously in disregard of Plaintiff Madden's constitutional rights and with callous and/or reckless indifference to Plaintiff Madden's constitutional rights and accordingly, Defendants should be punished by the award of punitive damages against them in addition to the other relief requested.

## PRAYER

WHEREFORE, Plaintiff prays for judgment against Defendants in their official and individual capacities, for compensatory damages in an amount equal to his past and future lost income and lost benefits in an amount as proved at trial, all economic losses on all claims allowed by law and punitive damages on all claims allowed by law in an amount to be determined at trial, and injunctive and equitable relief.

Plaintiff also requests recovery of his costs, expenses, and attorney's fees in accordance with 42 U.S.C. § 1983, 1983a and § 1988.

Respectfully submitted,

THE LAW OFFICE OF MCLAINE
DEWITT HERNDON, P.L.L.C.

s/ McLaine DeWitt Herndon
McLaine DeWitt Herndon, OBA No. 20674
320 South Boston Avenue, Suite 1026
Tulsa, OK 74103
(918) 595-3337 – *Telephone*
(918) 289-2612– *Facsimile*
mclaine@mdhok.com
*Attorney for Plaintiff*

## CERTIFICATE OF SERVICE

I hereby certify that on September 25, 2013 I electronically transmitted the attached document to the Clerk of Court using the ECF System for filing.  Based on the records currently on file, the Clerk of Court will transmit a Notice of Electronic Filing to the following ECF registrants:

M. Daniel Weitman, OBA #17412
Assistant Attorney General
Oklahoma Attorney General's Office
Litigation Division
313 N.E. 21st Street
Oklahoma City, OK  73105
Dan.Weitman@oag.ok.gov

s/ McLaine DeWitt Herndon