# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF OKLAHOMA

### DAVID P. MADDEN,

**Plaintiff,**

**v.**

**REGIONAL UNIVERSITY SYSTEM OF OKLAHOMA, a State of Oklahoma constitutionally created governing board; NORTHEASTERN STATE UNIVERSITY, a public university; CARI KELLER, an individual (in her individual and official capacity); PHILLIP BRIDGMON, an individual (in his individual and official capacity),**

**Defendants.**

## DEFENDANTS CARI KELLER AND PHILLIP BRIDGMON'S
## MOTION FOR SUMMARY JUDGMENT AND BRIEF IN SUPPORT

**M. DANIEL WEITMAN, OBA #17412**
**WILSON D. McGARRY, OBA#31146**
**Assistant Attorney General**
**Oklahoma Attorney General's Office**
**Litigation Division**
**313 NE 21st Street**
**Oklahoma City, Oklahoma 73105**
**Telephone: (405) 521-3921  Facsimile: (405) 521-4518**
**dan.weitman@oag.ok.gov**
**wilson.mcgarry@oag.ok.gov**
*Attorney for Defendants Cari Keller and Phillip Bridgmon*

**October 15, 2014**

# TABLE OF CONTENTS

**TABLE OF CONTENTS**. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . i

**TABLE OF AUTHORITIES**. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ii

**DEFENDANTS CARI KELLER AND PHLLIP BRIDGMON'S MOTION FOR SUMMARY JUDGMENT AND BRIEF IN SUPPORT**. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

**STATEMENT OF THE CASE**. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

**STATEMENT OF UNDISPUTED FACTS**. . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

**ARGUMENT AND AUTHORITY**. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

**PLAINTIFF'S SPEECH WAS NOT ON MATTERS OF PUBLIC CONCERN**. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

**THE DEFENDANTS' INTEREST IN REGULATING PLAINTIFF'S SPEECH OUTWEIGHED HIS INTEREST IN UTTERING THE SPEECH**. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

**EVEN WITHOUT CONSIDERING THE STATEMENTS MADE BY PLAINTIFF, DEFENDANTS STILL HAD GROUNDS TO NOT RETAIN HIM**. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

**CONCLUSION**. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

**CERTIFICATE OF SERVICE**. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

# TABLE OF AUTHORITIES

## CASES

*Anderson v. Creighton*,
483 U.S. 635, 107 S.Ct. 3034 (1987).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12, 13

*Anderson v. Kent State University*,
804 F.Supp.2d 575 (N.D. Ohio 2011). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

*Anemone v. Metro. Transp. Auth.*,
629 F.3d 97 (2d Cir. 2011).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

*Ashcroft v. Al Kidd*,
131 S.Ct, 2074 (2011). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

*Benson v. Allphin*,
786 F.2d 268 (7th Cir.), . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

*Brammer-Hoelter v. Twin Peaks Charter* Academy,
492 F.3d 1192 (2007).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

*Brosseau v. Haugen*,
543 U.S. 194 –199, 125 S.Ct. 596, 160 L.Ed.2d 583 (2004). . . . . . . . . . . . . . . . . . . 12

*Bunger v. University of Oklahoma Board of Regents*,
95 F.3d 987 (10th Cir. 1996).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14, 18

*Callahan v. Millard County*,
494 F.3d 891 (10th Cir. 1997).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11, 12

*Childers v. Ind. Sch. Dst. No.1*,
676 F.2d 1338 (10th Cir. 1982).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

*Clinger v. New Mexico Highlands University Bd. of Regents*,
215 F.3d 1162 (10th Cir. 2000). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14, 17

*Connick v. Myers*,
461 U.S. at 151, 103 S.Ct. at 1692. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

*Cragg v. City of Osawatomie*,
143 F.3d 1343 (10th Cir.1998). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

*Dartland v. Metropolitan Dade County*,
866 F.2d 1321 (11th Cir. 1989). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

*DiMeglio v. Haines*,
45 F.3d 790 (4th Cir. 1995). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

*Dodds v. Childers*,
933 F.2d 271 (5th Cir. 1991). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

*Finn v. New Mexico*,
249 F.3d 1241 (10th Cir. 2001). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

*Garcetti v. Ceballos*,
126 S.Ct. 1951 (2006). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13, 14, 22, 23

*Garcia v. Brownsville Independent School District*,
114 F.3d 1182 (5th Cir. 1997). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

*Gardetto v. Mason*,
100 F.3d 808 (10th Cir. 1996). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14, 23

*Guercio v. Brody*,
911 F.2d 1179 (6th Cir. 1990). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

*Hartman v. Moore*,
547 U.S. 250, 126 S.Ct. 1695, 164 L.Ed.2d 441 (2006). . . . . . . . . . . . . . . . . . . . . . . 27

*Kincade v. City of Blue Springs Missouri*,
64 F.3d 389 (8th Cir. 1995). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

*Koch v. Hutchinson*,
847 F.2d at 1452. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

*Kostic v. Texas A&M University at Commerce*,
___F.Supp.2d___, 2014 WL 1315657 (N.D. Tx. 2014). . . . . . . . . . . . . . . . . . . . . . . . 21

*Lane v. Franks*,
134 S.Ct. 2369 (2014). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20, 21

*Lee v. Board of County Commissioners of Arapahoe County, Colo.*,
18 F.Supp.2d 1143 (D. Colo 1998). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

*Malley v. Briggs*,
475 U.S. 335, 106 S.Ct. 1092 (1986). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

*McKennon v. Nashville Banner Publ'g Co.*,
513 U.S. 352, 115 S.Ct. 879, 130 L.Ed.2d 852 (1995). . . . . . . . . . . . . . . . . . . . . . . . . 27

*Medina v. Cramm*,
252 F.3d 1124 (10th Cir. 2001). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

*Melton v. City of Oklahoma City*,
879 F.2d 706 (10th Cir. 1989), . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

*Miles v. Denver Public Schools*,
944 F.2d 773 (10th Cir. 1991). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

*Moore v. Darlington Twp.*,
690 F.Supp.2d 378 (W.D. Penn 2010). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

*Moran v. State of Washington*,
147 F.3d 839 (9th Cir. 1998). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

*Mt. Healthy City Sch. Dist. v. Doyle*,
429 U.S. 274, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977). . . . . . . . . . . . . . . . . . . . . . . . 27, 28

*Murrell v. Sch. Dist. No. 1*,
186 F.3d 1238 (10th Cir. 1999)................................................... 11

*Noyla v. Texas Department of Human Resources*,
846 F.2d 1021 (5th Cir. 1988)................................................... 26

*Pahls v. Thomas*,
718 F.3d 1210 (10th Cir. 2013)................................................... 13

*Rankin v. McPherson*,
483 U.S. 378 (1987)................................................... 23

*Saucier v. Katz*,
533 U.S. 194 –202, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001)...................... 13

*Sawyer v. Smith*,
497 U.S. 227, 110 S.Ct. 2822, 111 L.Ed.2d 193 (1990). ........................ 13

*Taylor v. Carmouche*,
214 F.3d 788 (7th Cir. 2000)................................................... 22

*Trant v.* Oklahoma,
754 F.3d 1158 (10th Cir. 2014)................................................... 28

*Wren v. Spurlock*,
798 F.2d 1313 (10th Cir. 1986). ................................................... 23

## Statutes

Okla. Stat. Tit. 21 Sec 483................................................... 5

## Rules

Fed.R.Civ.P. 56. ................................................... 1

# IN THE UNITED STATES DISTRICT COURT FOR THE
# WESTERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| DAVID P. MADDEN, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | **Case No. CIV-13-393-HE** |
| | ) | |
| REGIONAL UNIVERSITY SYSTEM | ) | |
| OF OKLAHOMA, a State of Oklahoma | ) | |
| constitutionally created governing | ) | |
| board; NORTHEASTERN STATE | ) | |
| UNIVERSITY, a public university; | ) | |
| CARI KELLER, an individual (in her | ) | |
| individual and official capacity); | ) | |
| PHILLIP BRIDGMON, an individual | ) | |
| (in his individual and official capacity), | ) | |
| | ) | |
| Defendants. | ) | |

## DEFENDANTS CARI KELLER AND PHILLIP BRIDGMON'S MOTION FOR SUMMARY JUDGMENT AND BRIEF IN SUPPORT

COME NOW the Defendants, Cari Keller and Phillip Bridgmon, and, pursuant to Fed.R.Civ.P. 56, move for summary judgment in their favor. In support of this Motion, Defendants show the Court as follows:

## STATEMENT OF THE CASE

Plaintiff was a probationary assistant professor at Northeastern State University in Tahlequah, Oklahoma. Plaintiff began working as full time faculty at NSU in the academic year 2009-2010 and worked in the Criminal and Legal Studies Department, a unit of the College of Liberal Arts.  At the time of Plaintiff's hiring, Cari Keller was the chair of the Criminal and Legal Studies Department. In his position, Plaintiff was hired on the basis of

a yearly contract. Unless notified otherwise by March 1 of the previous year, Plaintiff's contract would be automatically renewed for an additional year.

In February 2012, NSU hired Phillip Bridgmon as Dean of the College of Liberal Arts at NSU and he began working at NSU in July of 2012. During the spring of 2012, NSU interviewed Shannon Bridgmon, wife of Dean Bridgmon, for a position as a professor at NSU.

While NSU was considering Shannon Bridgmon as an employee candidate, Brad Agnew, a professor of history at NSU, sent an email to Plaintiff asking whether he thought that the hiring of Shannon Bridgmon without a presidential waiver would violate the university's policy against nepotism. Brad Agnew was not on the university search committee and was not involved in the hiring process of Shannon Bridgmon. In an email, Plaintiff responded that he thought the hiring of Shannon Bridgmon without a waiver would violate the policy. NSU later hired Shannon Bridgmon as a professor in the Political Science Department. Shannon Bridgmon, however, received a waiver and reports to someone other than Phillip Bridgmon so as to avoid any nepotism issues.

In February, 2013, Cari Keller performed an employee evaluation of the Plaintiff. Keller gave Plaintiff marks of "meets" or "exceeds" criteria in every category evaluated. Keller suggested that Plaintiff needed to work on getting published and suggested that he contribute to the university's Journal of Contemporary Law and Justice, a peer reviewed journal. On February 17, 2013, Keller sent an email to Plaintiff expressing that she had been

told by Dean Bridgmon that Plaintiff had become upset with the Dean's administrative assistant. In response to Keller's email, Plaintiff requested a meeting with Keller. During the meeting on February 18, 2013, Keller has testified that Plaintiff challenged her competency as a department chair and claimed she was a poor leader who only hires morons. Plaintiff denies this but does admit that he referred to another professor as a moron during the meeting. After this meeting Keller began considering changing her recommendation of Plaintiff from retain to non-retention. On February 22, 2013, Ms. Keller checked with Dean Bridgmon to see if she could change her recommendation. Bridgmon advised that he would have to check with the provost and later responded that there was support from the provost for non-renewal.

On February 27, 2013, Plaintiff was advised by Dean Bridgmon that his contract was not being renewed for the following academic year. Keller placed a memorandum in Plaintiff's file listing a number of events which she alleges transpired or came to her attention which combined to cause her to change her recommendation.

Plaintiff asserts that the true reason his contract was not renewed is that he was retaliated against because of his speech. Defendants deny the allegations and assert that the non-renewal had nothing to do with Plaintiff's speech. Further, Defendants assert that even if Plaintiff had some evidence that Defendants acted out of retaliation against the Plaintiff, Plaintiff's speech was not protected by the First Amendment and even if it was, it was not so clearly established that liability can attach to the Defendants, individually.

## STATEMENT OF UNDISPUTED FACTS

1.      Effective August 17, 2009, Plaintiff was hired as an Assistant Professor of Criminal Justice at Northeastern State University. (Letter of Employment, dated November 20, 2009, Ex. 1).

2.      At the time, Cari Keller was the Chair of the Criminal Justice and Legal Studies Department. At all times relevant to this lawsuit, Ms. Keller was Chair of the Criminal Justice and Legal Studies Department. (Declaration of Cari Keller, Ex. 9).

3.      Phillip Bridgmon was hired as Dean of the College of Liberal Arts at NSU in February 2012. He began work at NSU in July 2012; At all times relevant hereto he was Dean of the College of Liberal Arts at NSU. (Declaration of Phillip Bridgmon, Ex. 17)

4.      In the spring of 2012, after a national search for professors, NSU interviewed Shannon Bridgmon, wife of Philip Bridgmon, for a position as professor of political science; (Deposition of Brad Agnew, pg. 23-24, Ex 2; Deposition of Phillip Bridgmon, pg. 94, Ex. 3).

5.      Brad Agnew is a professor of history at NSU and was not part of the search committee nor had any involvement in the hiring of Shannon Bridgmon. (Deposition of Brad Agnew, pg. 11-12; pg. 25, Ex. 2).

6.      On March 10, 2012, Brad Agnew sent an email to David Madden asking the following question:

> Am I correct in interpreting the second paragraph below [omitted] as saying that the university president would have to

grant a waiver and notify the regents if the wife of a dean of
Northeastern college were hired as a member of a department
within the dean's college?

(Email - Interpretation of a passage in the faculty handbook, Ex. 4; Deposition of Brad

Agnew, pg. 10-11, Ex, 2).

7.    On March 11, 2012, David Madden responded to Agnew's email:

Yes, I believe that the wife of a dean would fall squarely within
the language of paragraph 3.212 of the handbook. This appears
to be substantially a restatement of the RUSO policy regarding
nepotism from the RUSO handbook. There are several
attorney's general opinions that indicate that the nepotism
statute, Okla. State tit. 21 Sec 2001, Subsections 481-487 apply
to Oklahoma University officers and employees. I have tried to
find an interpretation of the policy by case-law specific to
Oklahoma Universities (without success so far) but I think the
language is clear. Failure to follow may be a violation of the
criminal code Okla. Stat. Tit. 21 Sec 483. It would appear to be
an ethics violation-but in Oklahoma the Ethics Commission gets
to decide that issue.

(Email - Interpretation of a passage in the faculty handbook, Ex. 4).

8.    On March 11, 2012, Agnew responded, "Thanks for the opinion. I had reached

the same conclusion based on total ignorance of the law." (Email - Interpretation of a passage

in the faculty handbook, Ex. 4).

9.    On February 10, 2013, Cari Keller prepared an evaluation of David Madden

as a professor in the Criminal Justice and legal Studies Department. (Evaluation, Ex. 5).

10.    In the February 10th evaluation, Ms. Keller scored Plaintiff as either meeting

or exceeding criteria in all categories (Evaluation, Ex. 5).

11.    Specifically as to scholarship and collegiality, Plaintiff was scored as having met criteria. (Evaluation, Ex. 5).

12.    In the section entitled "areas that need improvement", Ms. Keller suggested that Plaintiff become active in the departmental Journal of Contemporary Law and Justice. (Evaluation, Ex. 5).

13.    Keller also suggested that Plaintiff only teach a 4/4 course load (meaning no overload classes) so that he can focus on his scholarship. (Evaluation, Ex. 5).

14.    In the evaluation, Keller recommends that Plaintiff be retained for the academic year 2013-2014 and looked favorably on his progress toward tenure. (Evaluation, Ex. 5).

15.    The evaluation was signed by Plaintiff and Keller on February 11, 2013. (Evaluation, Ex. 5).

16.    On February 17, 2013, Keller informed Plaintiff that she had received information from Dean Bridgmon that Plaintiff had become agitated with the dean's administrative assistant. (Email -Concern Expressed to Me, Ex. 6).

17.    In the same email, Ms. Keller also stated a faculty member expressed concern that Plaintiff criticized another faculty member over a typo in an email. (Email -Concern Expressed to Me, Ex. 6).

18.    On February 18, 2013, Plaintiff responded to the February 17, 2013 email and requested a meeting to discuss it. Plaintiff and Keller scheduled a meeting for 3:00 p.m. that day. (Email -Concern Expressed to Me, Ex. 6).

19.     Later on that day, Plaintiff sent an email to Cari Keller stating, "I am reliably informed that you had a long conversation with Bill Corbett about me. I am just curious what that was about and how did that come about?" (Email - Me, Ex. 7).

20.     In her response, Ms. Keller advised Plaintiff about conversation with Bill Corbett and told him that they could discuss it further at the 3:00 meeting. (Email - Me, Ex. 7).

21.     Cari Keller testifies that during the 3:00 p.m. meeting on February 17, Plaintiff's behavior was unprofessional, that he told Keller that she was an ineffective leader, and that she only hired "morons". Plaintiff further stated that he did not see a problem with discussing the email typo and that he was not going to change his behavior because he did not see anything wrong with it. (Deposition of Cari Keller, Pg. 140, 177-179, Ex. 8; Declaration of Cari Keller, Ex. 9).

22.     Plaintiff admits that during the meeting he called Nikki Baker (an adjunct professor) a "moron" (Deposition of David Madden, Pg. 82, Ex. 10). This angered Cari Keller. (Deposition of David Madden, Pg. 83, Ex 10).

23.     Plaintiff admits also that he had discussions with other faculty about the email containing the typographical error. (Deposition of David Madden, Pg. 86, Ex. 10);

24.     Plaintiff admits that during his years of employment at NSU, he neither had any papers published nor did he submit any for publication. (Deposition of David Madden, Pg. 97-98, Ex. 10).

25.     Plaintiff admits that he was aware that there was a meeting of the Journal on February 22, 2013 and, even after Ms. Keller's suggestion that he become involved in the Journal, Plaintiff admits that he did not attend that meeting because it was not of interest to him. (Deposition of David Madden, Pg. 100-101, Ex. 10).

26.     After the meeting with David Madden on February 18, 2013, Cari Keller began to consider changing her recommendation regarding David Madden from retain to non-renew (Deposition of Cari Keller; Pg. 183, Ex. 8).

27.     On February 22, 2013, during a conversation with Phillip Bridgmon, Ms. Keller asked if she could change her recommendation. Dean Bridgmon responded that he would have to check with his superiors. (Deposition of Cari Keller, Pg. 123-124, Ex. 8; Deposition of Phillip Bridgmon, Pg. 100-101, Ex. 3; Email - Faculty, Ex. 11).

28.     After speaking to the provost, Dean Bridgmon reported to Ms. Keller that there is support (from the provost) for non-renewal. (Deposition of Phillip Bridgmon, Pg. 100-101, Ex 3; Email: Faculty, Ex. 11).

29.     Cari Keller responded that she would prepare a memo for Plaintiff's file which would be ready the following Monday. Dean Bridgmon responded that's all he would need. (Email: Faculty, Ex. 11).

30.     On February 24, 2013, Cari Keller transmitted the memo to Dean Bridgmon. (Email- Memo to File, Ex. 12; Memo to Personnel file dated February 25, 2013, Ex. 13).

31.     On February 27, 2013, Plaintiff met with Dean Bridgmon who notified the Plaintiff that he was not being renewed for the next academic year. Plaintiff was given a letter explaining that he was not being re-appointed. (Deposition of Phil Bridgmon, Ex. 3; Deposition of David Madden, Pg. 93-94, Ex. 10; Letter dated February 27, 2013, Ex.14).

32.     After meeting with Dean Bridgmon, Plaintiff requested a meeting with Cari Keller to ask why she had changed her recommendation.  (Email - Re:, Exhibit 15).

33.     Later that day, Dean Bridgmon asked Cari Keller how the meeting went with Plaintiff. Cari Keller responded (in pertinent part) as follows (Ex. 16):

. . .

I told him this: He had conflict issues since he started with the department. It was my hope that he would learn to control his aggression and tendency to be adversarial, and develop working relationships that would benefit the department. At the time that I wrote the evaluation, I was not aware of his latest outbursts. After talking about his actions with him, and the manner in which he assigned blame for his actions to everyone else, it demonstrated that he is not willing to develop that self control.

I told him that you made your decision based on his scholarship record and collegiality issues and I concurred. I stated that in his evaluations, I continued to suggest submitting to the journal or working on the journal. He never made the effort and refused to attend our most recent meeting, demonstrating further unwillingness to work with his colleagues and take my advice into account.

. . .

34.     Plaintiff has testified that the two items which caused his termination were the statements he made concerning the hiring of the Dean's wife and some statements he made

regarding the presidential race (referenced in the Memo to Personnel File, Par. 3, Exhibit 13; Deposition of David Madden, Pg. 88-89, Ex. 10).

35.     Dean Bridgmon denies knowing anything about Plaintiffs statements regarding the hiring of Shannon Bridgmon prior to the filing of Plaintiff's lawsuit. (Declaration of Phillip Bridgmon, Ex. 17).

36.     Prior to receiving the memo regarding David Madden (Ex. 12) from Ms. Keller, Phillip Bridgmon had already recognized that Plaintiff had not accomplished anything towards scholarship. (Deposition of Phillip Bridgmon, Pg. 35-36, Ex. 3).

37.     Cari Keller testifies that she never had a conversation with Phillip Bridgmon regarding the hiring of Shannon Bridgmon or the nepositism issue prior to the non-renewal of the Plaintiff. (Declaration of Keller, Ex. 9).

## ARGUMENT AND AUTHORITY

Plaintiff filed this lawsuit against these Defendants both in their individual and official capacities, Northeastern State University and the Regional University System of Oklahoma. In his verbose Complaint, Plaintiff alleged violations of his First and Fourteenth Amendment rights including allegations of First Amendment retaliation, violation of equal protection and violation of due process. [Doc. 1].  After the Court dismissed Plaintiff's due process of equal protection claim [Doc. 16], Plaintiff amended his Complaint in an attempt to resurrect his due process claim [Doc. 18]. On February 13, 2014, this Court again dismissed Plaintiff's due process claim, leaving  claim only a First Amendment retaliation claim for adjudication.

[Doc. 32]. Defendants assert that they have qualified immunity from Plaintiff's claims of retaliation..

Under the doctrine of qualified immunity, a state official maintains immunity from suit unless he violates a persons rights in the face of well clearly established law that would put the official on notice that he is violating a civil right. *Finn v. New Mexico*, 249 F.3d 1241 (10th Cir. 2001). Once a state official asserts qualified immunity, the plaintiff carries the burden of proving that (1) a constitutional right was violated and (2) that the contours of the law alleged to have been violated were sufficiently clear at the time of the official's acts. *Callahan v. Millard County* 494 F.3d 891 (10th Cir. 1997). In order for a law to be clearly established, either the Supreme Court or the Tenth Circuit must have decided a matter sufficiently similar to put the state official on notice of the contours of the law. *Callahan*, 494 F.3d 891; *Murrell v. Sch. Dist. No. 1*, 186 F.3d 1238 (10th Cir. 1999).

Qualified immunity protects all but the most incompetent state officials. *Medina v. Cramm*, 252 F.3d 1124, 1127 (10th Cir. 2001). Unless the state official violates a constitutional right in a way that the official knows or should know that is a violation, then qualified immunity attaches and the official cannot be held individually liable. *Id*. This proposition serves the same purpose as does absolute immunity; the official must be free to make reasonable decisions without fear of civil liability. Although not as broad as absolute immunity, by ensuring that an official is only liable when he knowingly violates a person's

rights, the official is free to fulfil his governmental responsibilities without fear of a retributive lawsuit.

What constitutes "clearly established" has been the source of much discussion in case law. What is well settled is that there must be a Supreme Court or Tenth Circuit decision clearly establishing a point of law or clearly established weight of authority from other circuits clearly establishing a point of law. *Callahan*, 494 F.3d 891. A broad statement of a general proposition is usually not enough to make a law clearly established, **the contours of the law must be clearly established in light of the factual situation faced by the Defendant**. *Anderson v. Creighton*, 483 U.S. 635, 639-640, 107 S.Ct. 3034, 3039 (1987). The law must be so clear that <u>any</u> reasonable state official would understand that an act she is taking is volative of a person's rights. *Id.* The burden is on the Plaintiff to demonstrate that the unlawfulness of the Defendants' conduct was **apparent**. *Callahan* at 898. Where reasonable state officials can disagree on whether an act violates a civil right, immunity must remain intact. *Malley*, 475 U.S., 341.

In *Ashcroft v. Al Kidd*, 131 S.Ct, 2074 (2011) the Supreme Court stated that in order for a law to be clearly established, "...existing precedent must have placed the statutory or constitutional provision beyond debate." Though the Court of Appeals had found clearly established law lurking in the broad "history and purposes of the Fourth Amendment." 580 F.3d, at 971

> We have repeatedly told courts—and the Ninth Circuit in particular, see *Brosseau v. Haugen*, 543 U.S. 194, 198–199, 125 S.Ct. 596, 160 L.Ed.2d 583

12

(2004) (per curiam)—not to define clearly established law at a high level of generality. See also, e.g., *Wilson*, supra, at 615, 119 S.Ct. 1692; *Anderson*, supra, at 639–640, 107 S.Ct. 3034; cf. *Sawyer v. Smith*, 497 U.S. 227, 236, 110 S.Ct. 2822, 111 L.Ed.2d 193 (1990). The general proposition, for example, that an unreasonable search or seizure violates the Fourth Amendment is of little help in determining whether the violative nature of particular conduct is clearly established. See *Saucier v. Katz*, 533 U.S. 194, 201–202, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001); *Wilson*, supra, at 615, 119 S.Ct. 1692.

Qualified immunity, therefore, is the rule. The exception being only when it is absolutely clear on the facts and through existing authority that a public official has violated the constitutional rights of another. *Pahls v. Thomas*, 718 F.3d 1210, 1227 (10th Cir. 2013) (qualified immunity is the norm in private actions against public officials and officials enjoy a presumption of immunity).

In order to establish a First Amendment violation, the plaintiff must establish the following elements: (1) the employee was not speaking pursuant to his official duties; (2) that the speech in question involved a matter of public concern; (3) balancing whether the employee's interest in the speech against the public employer's interest in regulating speech of its employees so that it can carry on an efficient and effective workplace; (3) the employee must show that the speech was a substantial factor driving the challenged governmental action; and (4) can the employer show that it would have taken the same employment action against the employee even in the absence of protected speech. *Brammer-Hoelter v. Twin Peaks Charter* Academy, 492 F.3d 1192, 1202-03 (2007). This is known as the *Garcetti/Pickering* analysis of free speech claims in the employment setting. The purpose in this test is that a public employer, while it cannot retaliate against an employee for

exercising First Amendment rights, must have some degree of freedom as an employer so that it can operate efficiently and effectively.

While a public employee may not be terminated for speaking out as a citizen on matters of public concern, *Garcetti v. Ceballos,* 126 S.Ct. 1951 (2006), for the speech to rise to the level of a matter of public concern, it must be "fairly considered as relating to any matter of political, social, or other concern to the community." *Gardetto,* 100 F.3d at 812. The First Amendment is not implicated if the speech concerns matters of personal interest. *Miles v. Denver Public Schools*, 944 F.2d 773 (10th Cir. 1991). The definition of "public concern" must be constrained by "the common-sense realization that government offices could not function if every important decision became a constitutional matter." *Bunger v. University of Oklahoma Board of Regents*, 95 F.3d 987, 992 (10th Cir. 1996). Speech concerning internal policies or individual personnel disputes will typically not involve public concern. *Clinger v. New Mexico Highlands University Bd. of Regents*, 215 F.3d 1162, 1166 (10th Cir. 2000). The First Amendment does not require government bodies "to subject internal structural arrangements and administrative procedures to public scrutiny and debate." *Id*. 215 F.3d at 1167.

In the case at bar, Plaintiff has failed to establish the elements necessary to support his claim of First Amendment retaliation. Even if this court finds, however, that Plaintiff has established the elements of his cause of action, the law is not so clearly established as to extinguish the presumption of qualified immunity which attaches to the Defendants.

## PLAINTIFF'S SPEECH WAS NOT ON MATTERS
## OF PUBLIC CONCERN

Plaintiff alleges that he made utterances on two subjects which were the reason for the decision to not renew his contract with NSU. First, Plaintiff claims that he was critical of the hiring of Dean Bridgmon's wife, Shannon, as a professor of political science at NSU. Even though Plaintiff's utterances on this matter occurred four months prior to Dean Bridgmon beginning his job duties with NSU, almost a full year before the decision was made to not renew Plaintiff's contract, and only criticized Shannon Bridgmon's hiring in the hypothetical event that no waiver from the University president was granted, Plaintiff asserts that this was the reason that his contract was not renewed by NSU. Even if this remarkable accusation is true, the statements made by Plaintiff are not matters of public concern as to implicate Plaintiff's First Amendment rights.

On March 10, 2012, Plaintiff was asked by a colleague, Dr. Agnew, whether he believed that the hiring of Shannon Bridgmon could be a violation of the University's nepotism policy if an appropriate waiver was not granted by the university president. The hiring committee was, at the time, considering the employment application of Shannon Bridgmon for the position of professor of political science. Dr. Agnew was not on the hiring committee and was seeking an answer to the nepotism question because he felt that it would

not be good for the nepotism procedure to be ignored.[1] Plaintiff responded that yes, he did believe that it could violate the school's nepotism policy, state law, and might be an ethical violation. These opinions were transmitted in a response email to Dr. Agnew.

To be clear, Plaintiff's email did not criticize the university nepotism policy nor the hiring of Shannon Bridgmon; rather, the utterance criticized the **potential** hiring of Shannon Bridgmon without following the proper procedure. This ultimately did not occur.[2] In other words, the email is a conversation between colleagues about a personnel issue which might occur in the future and that they might be critical of the hiring if certain safeguards were not followed. This certainly does not rise to the level of "public concern". It is a simple discussion of internal policy and possible future personnel issues.

The same is true regarding any other utterance Plaintiff claims to have made regarding to the hiring of Shannon Bridgmon. In his Complaint, Plaintiff identifies a communication between Dr. Corbett and Dr. Carper wherein Dr. Carper denied that the committee was being pressured to hire the dean's wife. *Amended Complaint* at 32. Later, Plaintiff joined the

---

[1] Cari Keller originally believed that Agnew was on the hiring committee and she voiced her concern that she believed that the hiring committee should not be asking legal questions of someone who was not the university's counsel. Keller has since come to learn that Agnew was, in fact, not on the hiring committee. (See Declaration of Cari Keller, Ex. 9).

[2] According the Dr. Agnew, when Shannon Bridgmon was hired, the administration followed the appropriate procedure. The president got an exception or informed the regents. Shannon Bridgmon was placed under the supervision of the Dean of the College of Education, not under her husband. Deposition of Dr. Agnew, P. 23-24, Ex. 2.

conversation and advised Corbett that Dr. Agnew was the source of the information being discussed.[3]

Once again, these are all simple communications among colleagues over personnel issues and are not made on matters of public concern. The facts of the case at bar are very similar to the facts in *Clinger v. New Mexico Highlands University Board of Regents*, 215 F.3d 1162 (10th Cir. 2000). In *Clinger*, plaintiff sued over a denial of tenure alleging that the defendants had acted in retaliation of plaintiff's exercise of her free speech rights. Plaintiff alleged that she publically criticized the university president and the Board of Trustees. She also alleged that she spoke out publically against a proposed academic reorganization. *Id* at 1166. The court held, however, that none of the plaintiff's utterances touched on matters of public concern. *Id.*

The *Clinger* court's decision turned on the fact that there were no public challenges to the integrity, qualifications or misrepresentations of any public officials. Plaintiff was essentially challenging the school's use of a particular process. The same is true here. Plaintiff, in his communications regarding the hiring of Shannon Bridgmon, did not accuse anyone of wrongdoing, lack of integrity or misrepresentations. Plaintiff's communications simply expressed that the school should follow its own policy and failure to do so could lead to criminal and ethical charges. Further, Plaintiff acknowledged that he was not the one

---

[3] Thus, the source of the nepotism discussion was Dr. Agnew who still teaches at NSU and was not disciplined for discussing the hiring of Shannon Bridgmon.

claiming that the hiring committee was under pressure. In essence, Plaintiff commented upon the "internal structure and governance" of the University, and matters of this nature "rarely transcend the internal workings of the university to affect the political or social life of the community." *Bunger v. University of Okla. Bd. of Regents*, 95 F.3d 987, 992 (10th Cir.1996). "The First Amendment does not require public universities to subject internal structural arrangements and administrative procedures to public scrutiny and debate." *Id*.

Next, Plaintiff raised a new issue in his deposition. Expressly basing his retaliation claim on only two statements at his deposition, he claimed that Keller also prohibited him from talking about the 2012 presidential election and that Keller testified that Madden was not permitted to discuss the presidential race. See Deposition of David Madden, pg. 88 - 89, Ex. 10.

While Plaintiff believes he remembered Keller stating the above, there is no such indication in Ms. Keller's testimony. Further, Plaintiff admits that the memo he refers to (Exhibit 13), represents the incident regarding Ms. Keller's comments concerning the presidential election. (Deposition of Madden at 88-89, Ex. 10). Plaintiff does not dispute that he had a heated discussion with Brett Fitzgerald and that Fitzgerald believed that Plaintiff was calling him a racist. (See: Deposition of Madden, Pg. 91-92, Ex. 10). While Plaintiff cannot recall when this conversation took place, he believes it was spring or summer of 2012, several months, at least, before he was non-retained. (Deposition of Madden at 92, Ex. 10).

Thus, Plaintiff cannot demonstrate that Ms. Keller advised that he was prohibited from discussing the presidential campaign or that he was non-renewed for doing so. On this issue, Plaintiff is left with what Ms. Keller wrote in the memo to Plaintiff's personnel file:

> I have also been made aware of an incident involving a Tahlequah based junior faculty member, Brett Fitzgerald, where Dr. Madden angrily referred to him as a "racist" in a heated conversation of the presidential race. A short time later, Mr. Fitzgerald was in the hallway discussing the republican convention with Dr. Becker. Dr. Cowlishaw came out of his office and said something to the effect of "your one of them"? Dr. Madden came out of his office and said "he is one of them" and began a critical conversation regarding Mr. Fitzgerald's political beliefs. Mr. Fitzgerald was uncomfortable with the situation as it was not conducted in a collegial tone.

Exhibit 12.

Clearly, Ms. Keller's focus was not on the content of Plaintiff's speech regarding the presidential campaign. Ms. Keller's focus was on the inappropriate manner in which Plaintiff conducted himself. She believed that Plaintiff called Fitzgerald a racist[4], that he was critical and attacking of a junior faculty members because of that person's political beliefs, and that he created a situation of discomfort for the junior faculty member. Ms. Keller considered this event as only one of several reasons for her determination that Plaintiff was un-collegial. As such, Plaintiff cannot make the causal connection between his **speech** and his non-renewal.

---

[4] Plaintiff denies that he called Fitzgerald a racist but admits that Fitzgerald believed that he had been called a racist. Deposition of Madden at 92, Ex. 10.

Nevertheless, Plaintiff's speech of calling a junior faculty member a racist (or even implying that he is one) and attacking him for his political beliefs does not go to a matter of public concern. There is nothing socially redeeming or of public interest or importance in the incident referenced in the memorandum.

Even if, however, this Court believes that Plaintiff's comments regarding the hiring of Shannon Bridgmon were matters of public concern or if the Court believes that Plaintiff's attack upon Mr. Fitzgerald contained speech which was a matter of public concern, the law is not sufficiently clear to overcome Defendant's assertion of qualified immunity.

Just last term, the United States Supreme Court demonstrated just how clearly the law needs to be established before qualified immunity in the First Amendment context can be lifted. In *Lane v. Franks*, 134 S.Ct. 2369 (2014), the plaintiff was terminated after giving testimony against her former supervisor. The plaintiff alleged that it was her First Amendment right to give the testimony which led to her termination. She sued under § 1983 to hold her supervisors liable. The Court held that the First Amendment protects an employee who provides sworn testimony outside the scope of her usual job duties. *Id*. at 2378. The first inquiry in the question, the Court said, is whether the sworn testimony was on a matter of pubic concern. It clearly was. *Id.* **However**, merely because the speech was clearly on a matter of public concern did not end the analysis. Even after finding that the speech at issue was clearly on a matter of public concern, the Court granted qualified immunity to the defendants. So long as the question of whether the matter was of public importance was not

"beyond debate" at the time the defendant terminated the plaintiff, the defendant is entitled to qualified immunity.

As *Lane* demonstrates, the law is clearly established only if it is beyond all debate that the speech which Plaintiff alleges was the cause of his termination was a matter of public concern. Even something as clearly protected as testifying did not overcome qualified immunity. In the case at bar, it is clearly not beyond all debate that Plaintiff's utterances were matter of public concern. In fact, most cases in which the key issue is whether a discussion of "nepotism" rises to the level of public concern have found that it does not. See: *Dodds v. Childers*, 933 F.2d 271, 273 (5th Cir. 1991) (Nepotism not a matter of public concern)*; Garcia v. Brownsville Independent School District*, 114 F.3d 1182 (5th Cir. 1997) (nepotism not a matter of public concern); *Moore v. Darlington Twp.*, 690 F.Supp.2d 378 (W.D. Penn 2010) (public comments of nepotism not matters of public concern); *Lee v. Board of County Commissioners of Arapahoe County, Colo.*, 18 F.Supp.2d 1143, 1159 (D. Colo 1998) (questionable whether nepotism rises to the level of public concern); *Kostic v. Texas A&M University at Commerce*, ___F.Supp.2d___, 2014 WL 1315657 (N.D. Tx. 2014) (statements concerning nepotism and provost's employment at university are not matters of public concern).

As well, there are no cases holding that calling someone a "racist" or otherwise belittling or criticizing a colleague is protected under the First Amendment even if the name calling is in relation to a political election. Again, courts which have examined similar cases

have determined that it is not a matter of public concern. See e.g.: *Taylor v. Carmouche*, 214 F.3d 788, 792 (7th Cir. 2000) (calling the provost a racist is not protected by the First Amendment); *Anderson v. Kent State University*, 804 F.Supp.2d 575 (N.D. Ohio 2011) (emails which contained name calling not of public concern). It is certainly not beyond all debate that Defendants could not take action against a professor who had called a junior professor a racist, was belittling of the other professor's beliefs, and handled himself in a non-collegial (uncivil) manner. The incident between Plaintiff and the junior faculty described in Ms. Keller's memo was only one example of a number of incidents leading to Ms. Keller's conclusion that Plaintiff was un-collegial (un-civil) with his colleagues. Defendants are entitled to qualified immunity.[5]

In sum, neither the Tenth Circuit nor the Supreme Court have clearly established that Madden's discussion of NSU's nepotism policy or his comments surrounding the junior faculty member are matters of public concern.

## THE DEFENDANTS' INTEREST IN REGULATING PLAINTIFF'S SPEECH OUTWEIGHED HIS INTEREST IN UTTERING THE SPEECH

Should this Court reach the third part of the *Garcetti/Pickering* analysis, Defendants should be granted qualified immunity at least as to the uncivil statements made to and about Brett Fitzgerald because Defendants' interests in regulating the speech outweighs Plaintiff's interests in the speech.

---

[5] It should be noted that Plaintiff has made no allegations that Dean Bridgmon took any action against him due to his comments to Brett Fitzgerald.

If it is determined that Plaintiff's speech did involve a matter of public concern, the *Pickering* balancing test requires the Court to weigh the interest of a public employee in commenting on such matters against the interest of the employer in promoting the efficiency of its services. *Gardetto v. Mason*, 100 F.3d, 808, 813 (10th Cir. 1996). In performing this balancing, the Court must not consider the statement in a vacuum. *Id*. (citation omitted). The employee's First Amendment rights "are protected 'unless the employer shows that some restriction is necessary to prevent the disruption of official functions or to insure effective performance by the employee.'" *Id*. [quoting *Wren v. Spurlock*, 798 F.2d 1313, 1318 (10th Cir. 1986) (quoting *Childers v. Ind. Sch. Dst. No.1*, 676 F.2d 1338, 1341 (10th Cir. 1982)]. Relevant considerations include "whether the statement impairs discipline by superiors or harmony among co-workers, has a detrimental impact on close working relationships for which personal loyalty and confidence are necessary, or impedes the performance of the speaker's duties or interferes with the regular operation of the enterprise." *Id*. (quoting *Rankin v. McPherson*, 483 U.S. 378, 387 (1987).

The Supreme Court elaborated on the analysis to be applied in conducting this balancing test if it is determined that an employee has spoken out on matters of public concern. In *Garcetti v. Ceballos,* the Supreme Court explained:

> The question becomes whether the relevant government entity had an adequate justification for treating the employee differently from any other member of the general public. This consideration reflects the importance of the relationship between the speaker's expressions and employment. A government acts in its role as employer, but the restrictions it imposes must be

directed at speech that has some potential to affect the entity's operations. *Id.*, 126 S.Ct. at 1960.

So too, close working relationships are essential to fulfilling the responsibilities of the job, so "a wide degree of deference to the employer's judgment is appropriate." *Koch v. Hutchinson*, 847 F.2d at 1452. (quoting *Connick v. Myers*, 461 U.S. at 151-52, 103 S.Ct. at 1692). Here, Plaintiff's conduct, even if deemed protected speech, was disruptive. Plaintiff's behavior, as understood by Ms. Keller, was demeaning and critical of a junior professor causing this junior professor to be uncomfortable. This type of behavior is certainly intended to have a negative impact on working relationships and the overall civility of discourse in the employment setting.

Even if this Court determines that the balancing weighs in favor of the Plaintiff, it is not so clear as to overcome Defendants' presumption of immunity. As the Supreme Court acknowledges, the *Pickering* balancing test is difficult to apply. *Id*. In most situations, it is nearly impossible to guess which way a court may decide that the balance tips. This leaves a state official in the unfair position of weighing the factors and trying to guess which way a court may decide. If the official is mistaken, she will face individual liability.[6] The majority of circuits addressing this problem of leaving a balancing test to a State official to

---

[6] Appellant concedes that there may be some fact scenarios which are so clear that any reasonable state official would know which way the balance tips. When a fact scenario is so clear that reasonable minds cannot differ as to which interest prevails, the state official must adhere to the prevailing interest or face possible individual liability. The case at bar, is not such a case.

apply have generally held that a law is not well established if the official must undergo the *Pickering* balancing test. Although this is not applied as a *per se* rule, qualified immunity is found to exist unless the facts tip the balance of the test so far to the Plaintiff's side that there could be no reasonable doubt as to whether the official's actions were lawful.

The Tenth Circuit addressed this issue in *Melton v. City of Oklahoma City*, 879 F.2d 706 (10th Cir. 1989), *modified on other grounds*, 928 F.2d 920 (10th Cir. 1991). In *Melton*, the plaintiff, a police officer, alleged that he was terminated for exercising his First Amendment rights in testifying in a trial, and further alleged that he was terminated for talking to the defense attorney before the trial. The individual defendants raised the defense of qualified immunity.

Analyzing whether the law was clearly established when it was necessary for the Defendants to undergo the *Pickering* balancing test, the Court determined that a black letter rule was impossible. However, generally, a state official is entitled to a presumption in favor of immunity for public officials acting in their individual capacities. *Melton* at 728-729. The Court reasoned that because a rule of law determined by balancing interests is inevitably difficult to clearly anticipate, it follows that where *Pickering* balance is required, the law is less likely to be clearly established than in other cases. *Id. See also: Benson v. Allphin*, 786 F.2d 268, 276 (7th Cir.), *cert. denied*, 479 U.S. 848 (1986). *Moran v. State of Washington*, 147 F.3d 839 (9th Cir. 1998) (Defendants cannot be held to predict the outcome of the *Pickering* balancing); *Dartland v. Metropolitan Dade County*, 866 F.2d 1321 (11th Cir. 1989)

(when a balancing test is required, there is rarely a basis for an *a priori* judgment that the termination of the employee violated clearly established rights); *Noyla v. Texas Department of Human Resources*, 846 F.2d 1021 (5th Cir. 1988) (qualified immunity generally exists where a balancing test is necessary to determine whether there was a constitutional violation); *DiMeglio v. Haines*, 45 F.3d 790 (4th Cir. 1995) (Only infrequently will it be clearly established for the purposes of qualified immunity analysis that a public employee's speech on a matter of public concern is constitutionally protected, as relevant inquiry requires particularized balancing that is subtle, difficult to apply, and not yet well defined); *Kincade v. City of Blue Springs Missouri*, 64 F.3d 389 (8th Cir. 1995) (When fact intensive *Pickering* balancing test is at issue, asserted First Amendment right can rarely be considered "clearly established" for purposes of qualified immunity standard); *Guercio v. Brody*, 911 F.2d 1179 (6th Cir. 1990) (If reasonable officials can disagree as to the outcome of the *Pickering* balancing test, then qualified immunity has been established).

In the case at bar, Defendants had to balance the disruption caused by Plaintiff's actions. Certainly, maintaining civility among colleagues is of high interest to the Defendants and Plaintiff's perceived behavior was disruptive. Defendants could have easily believed it justified to regulate Plaintiff's speech in the interest of preserving a civil working environment. At a minimum, Defendants were not on notice of any clearly established law that the balancing could not justify the regulation of Plaintiff's speech. As such, the Defendants are entitled to qualified immunity.

## EVEN WITHOUT CONSIDERING THE STATEMENTS MADE BY PLAINTIFF, DEFENDANTS STILL HAD GROUNDS TO NOT RETAIN HIM

If the Court finds that Plaintiff has established that his speech was protected and was a motivating factor behind his non-renewal, "the burden then shifts to the defendant, who must show by a preponderance of the evidence it would have reached the same employment decision in the absence of the protected activity." *Cragg v. City of Osawatomie*, 143 F.3d 1343, 1346 (10th Cir.1998) (citing *Mt. Healthy City Sch. Dist. v. Doyle*, 429 U.S. 274, 287, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977)). This inquiry, the Mt. Healthy analysis, arises from the Supreme Court's recognition that a "rule of causation which focuses solely on whether protected conduct played a part" in an adverse employment decision "could place an employee in a better position as a result of the exercise of constitutionally protected conduct than he would have occupied had he done nothing." *Mt. Healthy*, 429 U.S. at 285, 97 S.Ct. 568; see also *Id*. at 286, 97 S.Ct. 568 ("But [a borderline or marginal] candidate ought not to be able, by engaging in [protected] conduct, to prevent his employer from assessing his performance record and reaching a decision not to rehire on the basis of that record, simply because the protected conduct makes the employer more certain of the correctness of its decision."); *Hartman v. Moore*, 547 U.S. 250, 260, 126 S.Ct. 1695, 164 L.Ed.2d 441 (2006) (discussing Mt. Healthy) ("If there is a finding that retaliation was not the but-for cause of the discharge, the claim fails for lack of causal connection between unconstitutional motive and resulting harm, despite proof of some retaliatory animus in the official's mind."); *McKennon v. Nashville Banner Publ'g Co.*, 513 U.S. 352, 359, 115 S.Ct. 879, 130 L.Ed.2d

852 (1995) ("We held [in Mt. Healthy ] that if the lawful reason alone would have sufficed to justify the firing, the employee could not prevail in a suit against the employer.").

Summary judgment is appropriate when "any reasonable jury would [have found] that [the plaintiff] would have been terminated even absent any desire on the Defendants' part to punish him in retaliation for his allegedly protected speech." *Trant v.* Oklahoma, 754 F.3d 1158, 1167-1168 (10th Cir. 2014); *Anemone v. Metro. Transp. Auth.*, 629 F.3d 97, 117 (2d Cir. 2011) Thus, for example, in *Anemone*, the court found that the "undisputed evidence" of the plaintiff's insubordination and the employer's "ongoing efforts to address it—efforts beginning well before any allegedly protected conduct—" were sufficient to meet the defendants' burden at the summary judgment stage. 629 F.3d at 117. *Anemone* is instructive in its discussion on the proper way to conduct a *Mt. Healthy* analysis:

> [A]lthough the language in Mt. Healthy refers to the plaintiff's [protected] conduct, the Court's analysis, properly understood, attempts to weigh the impact of the defendant's impermissible reason on the defendant's decision to act.... The relevant question then, with respect to Anemone's speech to the [New York] Times, is not whether he would have suffered termination absent the speech itself, but rather whether even without the improper motivation the alleged retaliatory action would have occurred.

*Id.* at 120.

In the case at bar, the reasons given to Plaintiff for his termination were that he was non-collegial and his lack of scholarship. Plaintiff admits that he wanted to have a meeting with Ms. Keller to discuss the alleged outburst he had with the Dean's administrative

assistant and to discuss the "heated conversation" with Professor Bill Corbett. It is undisputed that during this meeting, he referred to adjunct professor Nikki Baker as a "moron". It is also undisputed that in his four years of teaching, Plaintiff had not been published nor had he submitted anything for publication. Because of this, Ms. Keller, his chair and supervisor, recommended that Plaintiff become active in the department's Journal of Contemporary Law. Despite the recommendation, Plaintiff chose not to attend a February 22, 2013 Journal meeting. The facts demonstrate more than ample reason for Plaintiff, a fourth year probationary professor, to not be retained with a new contract for the next academic year. Thus, even without considering the motivations of the Fitzgerald matter or the Shannon Bridgmon matter, Defendants have demonstrated more than enough reason to have ended their relationship with the Plaintiff.

## CONCLUSION

Summary Judgment should be granted in favor of the Defendants because they have qualified immunity on Plaintiff's claims.

Respectfully submitted,

s/ M. Daniel Weitman
**M. DANIEL WEITMAN, OBA #17412**
**WILSON D. McGARRY, OBA #31146**
Assistant Attorney General
Oklahoma Attorney General's Office
Litigation Section
313 N. E. 21st Street
Oklahoma City, Oklahoma   73105
Tele: (405) 521-3921   Fax: (405) 521-4518
Dan.Weithman@oag.ok.gov
Wilson.McGarry@oag.ok.gov
*Attorneys for Defendants*

## CERTIFICATE OF SERVICE

I hereby certify that on October ___, 2014, I electronically transmitted the foregoing document to the Clerk of Court using the ECF System for filing and transmittal of a Notice of Electronic Filing to the following ECF registrants:

McLaine DeWitt Herndon
mclaine@mdhok.com

s/M. Daniel Weitman
M. Daniel Weitman