# IN THE UNITED STATES DISTRICT COURT FOR THE
# WESTERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| DAVID P. MADDEN, | ) | |
| | ) | |
| Plaintiff, | ) | |
| vs. | ) | NO. CIV-13-0393-HE |
| | ) | |
| REGIONAL UNIVERSITY SYSTEM, | ) | |
| OF OKLAHOMA, a State of Oklahoma | ) | |
| constitutionally created governing | ) | |
| board; NORTHEASTERN STATE | ) | |
| UNIVERSITY, a public university; | ) | |
| CARI KELLER, an individual (in her | ) | |
| individual and official capacity); | ) | |
| PHILLIP BRIDGMON, an individual | ) | |
| (in his individual and official capacity), | ) | |
| | ) | |
| Defendants. | ) | |

## ORDER

Plaintiff David Madden, formerly a non-tenured professor at Northeastern State University ("NSU"), in Tahlequah, Oklahoma, brought this case against his former employer and supervisors pursuant to 42 U.S.C. § 1983. He initially asserted multiple constitutional claims arising from the non-renewal of his contract for the 2013-2014 academic year. Certain of his claims have been dismissed by prior orders of the court, and only plaintiff's First Amendment retaliation claims against defendants Cari Keller and Phillip Bridgmon, in their individual capacities, remain for resolution. Those defendants have moved for summary judgment on the remaining claims, arguing they are entitled to qualified immunity from them.

Under Fed.R.Civ.P. 56(a), summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." In applying this standard, a court views the evidence in the light most

favorable to the party opposing summary judgment. Grynberg v. Total, S.A., 538 F.3d 1336, 1446 (10th Cir. 2008).

"The doctrine of qualified immunity shields public officials...from damages unless their conduct was unreasonable in light of clearly established law." Elder v. Holloway, 510 U.S. 510, 512 (1994). To rebut a defendant's qualified immunity defense, a plaintiff must show (1) that the official violated a statutory or constitutional right, and (2) that the right was "clearly established" at the time of the challenged conduct. Ashcroft v. al-Kidd, 131 S.Ct. 2074, 2080 (2011). When asserted on summary judgment, a court "must grant qualified immunity unless the plaintiff can show (1) a reasonable jury could find facts supporting a violation of a constitutional right, which (2) was clearly established at the time of the defendant's conduct." Estate of Booker v. Gomez, 745 F.3d 405, 411 (10th Cir. 2014). Either element may be considered first. *Id.* at 412.

As stated more fully below, the court concludes plaintiff has not made the necessary showing and that defendants are entitled to judgment based on qualified immunity.

## Background

The bulk of the background facts are undisputed.[1] Plaintiff was employed as a non-

---

[1] *Plaintiff has employed an improper means of responding to what defendants assert are the undisputed facts. Rule 56(c) requires that a party disputing an asserted fact do so by citing to particular materials or parts of the record which controvert the asserted fact. L.Cv.R. 56.1 requires that those materials be tied, by specific reference, to the opposing parties' asserted facts. By contrast, plaintiff's response simply denies some of the asserted facts, alleging they are disputed, but cites nothing to support the allegation. Or, it acknowledges that defendants' evidence says what it says, but is silent as to whether the underlying fact asserted is or is not true. The brief then sets out a separate and competing statement of the undisputed facts, i.e., plaintiff's version of the case, and leaves the court with the task of trying to discern what facts in plaintiff's listing purportedly*

tenured assistant professor at NSU from 2009 until 2013. He taught in the Criminal and Legal Studies Department, a division of the College of Liberal Arts. At the time of plaintiff's non-renewal, defendant Keller was the chair of NSU's Criminal and Legal Studies Department, and defendant Bridgmon was the Dean of the College of Liberal Arts.

On February 10, 2013, Keller conducted an evaluation of plaintiff, concluded that he met or exceeded the various evaluation standards, and recommended that he be retained for another year. On February 17, 2013, Keller advised plaintiff that she had since received information as to his conduct, including allegations of contentious exchanges with a staff member and criticism of other faculty members. That led to a meeting on February 18, 2013, between Keller and plaintiff. The parties dispute exactly what was said at the meeting, but it is clear the meeting was contentious, with plaintiff at one point describing another faculty member hired by Keller as a "moron." After consulting with Bridgmon and others over the next several days, Keller changed her recommendation as to the retention of plaintiff. On February 24, 2013, she recommended to Bridgmon that plaintiff not be retained, relying on several incidents she viewed as reflecting unreasonable conduct in dealing with others and on other factors. On February 27, 2013, Dean Bridgmon advised plaintiff that he would not be retained for the succeeding year.

Plaintiff's contention here is that he was terminated in retaliation for comments he had made previously, contrary to his rights under the First Amendment. He relies on two

---

*controvert the facts asserted by defendants. That is <u>not</u> the court's job nor is it what the rules contemplate, and could (though it did not here) result in summary judgment being granted based on plaintiff's failure to appropriately respond.*

3

instances of prior speech as the basis for the claimed retaliation.

The first such instance involved an opinion he had expressed approximately a year earlier as to interpretation of the faculty handbook, relating to the university's anti-nepotism policy. It is undisputed that, on March 10, 2012, plaintiff received an email from another professor entitled "Interpretation of a passage in the faculty handbook."[2] That professor asked if a quoted passage from the handbook meant that "the university president would have to grant a waiver and notify the regents if the wife of the dean of a Northeastern college were hired as a member of a department within the dean's college?" Plaintiff responded by agreeing with that interpretation and identifying other policies, state statutes, and ethics codes that might also be violated if the proper procedures were not followed. The other professor had sought the opinion based on questions he and others had related to the potential employment of Dean Bridgmon's wife, a political science professor, by the university. As of

---

[2]*The initial email read, "Am I correct in interpreting the second paragraph below as saying that the university president would have to grant a waiver and notify the regents if the wife of the dean of a Northeastern college were hired as a member of a department within the dean's college?" and included the text of the nepotism policy.*

*Plaintiff responded, "Yes, I believe that the wife of a dean would fall squarely within the language of paragraph 3.212 of the handbook. This appears to be substantially a restatement of the RUSO policy regarding nepotism from the RUSO handbook. There are several attorney's general opinions that indicate that the nepotism statute, Okla. State, tit. 21 Sec 2001, Subsections 481-487 apply to Oklahoma University officers and employees. I have tried to find an interpretation of the policy by case-law specific to Oklahoma Universities (without success so far) but I think the language is clear. Failure to follow may be a violation of the criminal code Okla. Stat. tit. 21 I Sec 483. It would appear to be an ethics violation- but in Oklahoma the Ethics Commission gets to decide that issue."*

*The email string ends with the other professor saying "Thanks for the opinion. I had reached the same conclusion based on total ignorance of the law."*

4

that March date, Bridgmon had been hired to serve as the Dean of the College of Liberal Arts, but had not yet assumed the position. While the potential employment of Bridgmon's wife appears to have been a source of much discussion over the succeeding months, it is clear that the question posed to plaintiff, and his response, were directed to a hypothetical issue not identifying Bridgmon or any other person. It also appears that plaintiff did not know the background circumstances at the time he expressed his opinion. [Doc. #96-4 p. 2].[3]

The second statement, or group of statements, involved plaintiff's discussions with other professors.[4] The specifics of the statements are disputed, but it appears the discussions occurred in the period leading up to the 2012 election. There was some sort of hallway discussion between plaintiff and two other professors at the time of the Republican National Convention, which apparently included plaintiff or one of the other professors criticizing a third (Fitzgerald) for being "one of them," i.e., a Republican. The discussion became contentious, prompting complaints by Fitzgerald at some point.[5] During the same general period, there was another heated discussion involving plaintiff and Fitzgerald. This dispute arose at Fitzgerald's home where, over wine and dominoes, plaintiff, Fitzgerald and others

---

[3]*Ms. Bridgmon was eventually hired. Defendants indicate in their brief that the proper procedures were followed to effect a waiver of the anti-nepotism policy, including alternate arrangements for her supervision, but that question is not squarely addressed by the parties' submissions and does not impact the decision here.*

[4]*Plaintiff's complaint did not rely on this second group of statements, but the disagreement between the professors involved was mentioned in Keller's memo documenting the non-renewal.*

[5]*Keller's memo to file documenting the non-renewal recommendation referenced this as a "heated discussion over the presidential race" that was confrontational and not conducted in a "collegial tone."*

5

got into an argument over whether the disciplinary treatment of African-Americans was appropriate or not, whether Fitzgerald was or was not a "self-made man," and whether plaintiff or someone else called Fitzgerald a racist, or referred to him as such. The specifics of the discussion are disputed, though it appears undisputed that the discussion was contentious and hot. The incident was mentioned by Keller in her non-renewal memo as suggesting a lack of collegiality on plaintiff's part.

Analysis

As noted above, plaintiff's remaining claims are for First Amendment retaliation. "It is clearly established that a State may not discharge an employee on a basis that infringes that employee's constitutionally protected interest in freedom of speech." Rankin v. McPherson, 483 U.S. 378, 383 (1987). Determining whether a public employee's speech is protected by the First Amendment involves a two-step inquiry. Lane v. Franks, 134 S.Ct. 2369, 2378 (2014). The first question is whether the employee spoke as a citizen on a matter of public concern. If he did, the second question requires the court to determine whether the government has a constitutionally sufficient justification for penalizing the employee, by balancing the interest in allowing the speech against the interest in penalizing it. *Id.* That balancing is done based on a five part inquiry set out in Garcetti v. Ceballos, 547 U.S. 410 (2006), and Pickering v. Bd. of Educ., 391 U.S. 563 (1968), (i.e., the "Garcetti/Pickering test"), which analyzes the following:

> (1) whether the speech was made pursuant to an employee's official duties; (2) whether the speech was on a matter of public concern; (3) whether the government's interests, as employer, in promoting the efficiency of the public

service are sufficient to outweigh the plaintiff's free speech interests; (4) whether the protected speech was a motivating factor in the adverse employment action; and (5) whether the defendant would have reached the same employment decision in the absence of the protected conduct.

The first three elements of the inquiry are matters of law to be decided by the court. Morris v. City of Colorado Springs, 666 F.3d 654, 661 (10th Cir. 2012).

The question of whether plaintiff's statements were matters of public concern—the threshold inquiry referenced in Lane, is determinative here.[6] In general, matters of public concern are those "of interest to the community, whether for social, political or other reasons." *Id.* In the public employment context, speech relating to "internal personnel disputes" is not ordinarily viewed as addressing a matter of public concern. *Id.* (citing David v. City & Cnty. of Denver, 101 F.3d 1344, 1355 (10th Cir. 1996)). To determine if the statement touches on a matter of public concern, the court considers the "content, form, and context of a given statement, as revealed by the whole record." Connick v. Myers, 461 U.S. 138, 142 (1983). In all cases, however, the crux of the inquiry is "what is actually said on the topic." Morris, 666 F.3d at 661 (quoting Wren v. Spurlock, 798 F.2d 1313, 1317 n. 1 (10th Cir. 1986)). Finally, because the issue arises here in the context of defendants' assertion of qualified immunity, plaintiff has the additional burden of showing that the pertinent "public concern" element was "clearly established" as of February 27, 2013, the date of his non-renewal. *See* al-Kidd, 131 S.Ct. at 2085.

Law is clearly established if a sufficiently similar matter has been decided by a either

---

[6]*The parties appear to assume, as does the court, that plaintiff's statements were in a "citizen," rather than an "employee," capacity.*

7

a Supreme Court or Tenth Circuit case, or the "clearly established weight of authority from other courts." Clark v. Wilson, 625 F.3d 686, 690 (10th Cir. 2010) (quotation omitted). To be "clearly established,"

> [t]he contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right. This is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful; but it is to say that in the light of pre-existing law the unlawfulness must be apparent.

Anderson v. Creighton, 483 U.S. 635, 640 (1987).

Insofar as plaintiff relies on the "nepotism" email, the court concludes plaintiff has made out neither a basis for concluding that his constitutional rights were violated or that the pertinent rights were clearly established. As noted above, the question of what constitutes a matter of public concern has generally been understood to exclude internal personnel matters. The Tenth Circuit has applied that principle in circumstances similar to those of this case. In Clinger v. New Mexico Highlands Univ. Bd. of Regents, 215 F.3d 1162 (10th Cir. 2000), a professor challenged her denial of tenure on the basis the denial was in retaliation for comments she had made critical of the university and its regents. Specifically, she had spoken to the Faculty Senate urging a "no confidence" vote as to four members of the board of regents, on the basis of their alleged non-compliance with a university policy involving selection of the president. She singled out one regent as "untrustworthy" based on his role in the process. She also criticized the new university president for accepting the position and was generally critical of the academic reorganization then underway. The Court of Appeals concluded that these statements "did not touch on matters of sufficient public concern to merit

8

constitutional protection." *Id.* at 1166. Quoting Bunger v. Univ. of Oklahoma Bd. of Regents, 95 F.3d 987, 992 (10th Cir. 1996), the Court noted that plaintiff had essentially challenged the "internal structure and governance of the University, and matters of this nature 'rarely transcend the internal workings of the university to affect the political or social life of the community.'" Clinger, 215 F.3d at 1167.

Here, the "nepotism" email on which plaintiff relies is several steps further away from being a matter of "public concern" than the circumstances involved in Clinger. In the email, plaintiff did not criticize any particular person or process, or suggest misconduct on anyone's part, but responded only to a hypothetical question as to how the faculty handbook should be interpreted. It did not address any particular action of the university, but addressed a potential situation that had not yet arisen. If, as Clinger suggests, the far more pointed comments of the plaintiff in that case did not constitute comments on matters of public concern, then it is extraordinarily difficult to see how plaintiff's nepotism email could qualify here. Even viewing the facts in the light most favorable to plaintiff, he has not shown a basis for concluding that his constitutional rights were violated based on the email.

Even if the court were to view Clinger as a too-narrow application of the "public concern" element, it would nonetheless require judgment in defendants' favor on the basis of qualified immunity. At the very least, Clinger illustrates that a right to First Amendment protection in these circumstances was not "clearly established" at the time of plaintiff's non-renewal. The "nepotism" email cannot serve as a basis for plaintiff's retaliation claim.

To the extent plaintiff relies on his statements in connection with the arguments with

9

Fitzgerald, they do not lead to a different conclusion. As noted above, "what is actually said" is the crux of the inquiry. The episode at Fitzgerald's house apparently involved a spirited discussion of Fitzgerald's motivation for the views he held, but that is plainly not a matter of public concern. Plaintiff's involvement in "outing" Fitzgerald as a Republican may have been of interest to others in the department, but also does not qualify as a matter of public concern. Plaintiff attempts to cast the circumstances as involving defendants retaliating against him for simply talking about the presidential election, but there is nothing in the parties' submissions to plausibly support such a claim. The only mention of plaintiff's speech is in Keller's memo to the personnel file, which provides no detail as to what was said nor does it otherwise support an inference that he was non-renewed because of his interest in the presidential election or because of the content of his opinions. In the context of a qualified immunity analysis, the burden is on plaintiff to make a sufficient showing to at least put a potential constitutional violation in issue and avoid the qualified immunity defense. Plaintiff has not done so as to the Fitzgerald-related comments.

## Conclusion

For the reasons stated, the court concludes that defendants are entitled to qualified immunity on the remaining claims. Defendants' motion for summary judgment on that basis [Doc. #86] is **GRANTED**. As this resolves all remaining claims after giving effect to the court's prior orders, judgment will be entered separately for all defendants.

**IT IS SO ORDERED**.

Dated this 24th day of December, 2014.

_____
JOE HEATON
UNITED STATES DISTRICT JUDGE